Martin J. Bienenstock
Timothy Q. Karcher (admitted *pro hac vice*)
Steven H. Holinstat
Chris Theodoridis
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Counsel to the Ad Hoc Committee of Equityholders*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | Case No. 19-33694 (DRJ) |
| WEATHERFORD INTERNATIONAL | § | |
| PLC, *et al.*, | § | Chapter 11 |
| | § | |
| Debtors.[1] | § | (Emergency Hearing Requested) |
| | § | (Jointly Administered) |
| | § | |
| AD HOC COMMITTEE OF | § | |
| EQUITYHOLDERS, | § | |
| | § | |
| Movant, | § | |
| | § | |
| -against- | § | |
| | § | |
| WEATHERFORD INTERNATIONAL PLC, | § | |
| *et al.*, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## EMERGENCY MOTION OF AD HOC
## COMMITTEE OF EQUITYHOLDERS FOR AN ORDER
## APPOINTING AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Weatherford International plc (6750); Weatherford International Ltd. (1344); and Weatherford International, LLC (5019).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 2000 St. James Place, Houston, TX 77056.

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 1, 2019 AT 2:00 P.M. CENTRAL TIME IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TX 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN AUGUST 1, 2019.**

To the Honorable United States Bankruptcy Judge David R. Jones:

The Ad Hoc Committee of Equityholders (the "Movant")[2] hereby files this emergency motion (this "Motion") pursuant to section 1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Weatherford International plc ("Weatherford Parent") and its debtor-affiliates (collectively, the "Debtors") for an order appointing a statutory committee of equity security holders (an "Equity Committee") to represent the Debtors' equity security holders (collectively, the "Shareholders"). In support of this Motion, the Movant respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Something doesn't seem right here.

2.      On April 30, 2019, just 60 days before the Petition Date, Weatherford Parent's Board of Directors (the "Board") solicited votes from the Shareholders for a reverse stock split (the "Reverse Stock Split") to keep Weatherford Parent's common stock trading on the New York Stock Exchange (NYSE) and make existing equity more attractive to investors.  Ten days later, that decision was abruptly reversed.  On May 10, 2019, the Company announced it had entered

---

[2] Information regarding the holdings of the Ad Hoc Committee of Equityholders can be found in the *Verified Statement Pursuant to Bankruptcy Rule 2019 of Ad Hoc Committee of Equityholders* [ECF No. 164].

into the RSA (defined below) with its Noteholders (defined below).  Trading in the Company's shares was suspended by the NYSE, and the next day, the stock was delisted.  At first, the Company was championing its stock, then hundreds of millions of dollars in market capitalization were erased overnight.

3.      The RSA (and the chapter 11 Plan that followed) generally provides for approximately (i) 94% of the New Common Stock (defined below) to be distributed to the Noteholders, (ii) 5% of the New Common Stock to be set aside as part of a management incentive plan (the "MIP") as a reward for executives, and (iii) 1% of the New Common Stock to be distributed to existing Shareholders.  The Noteholders will also receive Plan consideration comprised of $1.25 billion of Tranche B Exit Notes.  Under the Plan, the Board gets comprehensive releases from the Debtors and the Noteholders.  The CEO keeps his job (including his position on the Board), and the remaining members of the Board can (potentially) interview to keep their Board seats.

4.      After confirmation of the Plan, the Company's management will stand to own up to 5% of the fully deleveraged Company.[3]  In other words, management will get 400% more recovery than the current Shareholders will receive.[4]  This is in addition to the payments under various bonus and retention programs made by non-Debtor affiliates on the eve of bankruptcy, in April and May of 2019.  *See* Disclosure Statement at 12-13.

---

[3] It is not clear at this point whether the 5% of reorganized equity distributed to management under the MIP is a disguised distribution pursuant to the Plan, which may be a form of unfair discrimination against the Shareholders or raise Bankruptcy Code section 1123(a)(4) concerns.  An Equity Committee would be the appropriate party to investigate such concerns.

[4] On April 30, 2019, the Company's named executive management held approximately 0.37% of a fully levered Company.  The 0.37% figure was compiled by aggregating the amount of securities beneficially owned by the Debtors' five named executives from their most recent SEC Form 4s.  *See* SEC Form 4, Weatherford International plc (February 4, 2019; February 4, 2019; February 7, 2019; June 10, 2019; April 24, 2019).  It is not clear at this point, and possibly will not even be disclosed prior to Plan consummation, which executives will be the beneficiaries of the MIP.

5.     In addition, the Company's financial projections seem to have varied to fit whatever narrative the Company was trying to support at any given point in time:  How could the projections of a sophisticated company have been so unreliable?  In February 2019, just a few months before the RSA, the Company stated on an earnings call that its goal was to put the Company on track to achieve a "$1 billion incremental EBITDA run rate by the end of 2019" and the Company's CEO emphasized "we continue to believe that we can deliver on our $1 billion commitment by the end of 2019."[5]  In May, at the time of the press release announcing the RSA, 2019 EBITDA was projected to be approximately $750 million.  By June, the Debtors projected 2019 EBITDA to be $640 million. *See* Disclosure Statement at Exhibit D.

6.     The five-month continuous decline in projected 2019 EBITDA begs the obvious question: is there a correlation between the 2019 underperformance and the Company's decision to focus on "in-court" options instead of their out-of-court "Transformation Plan" which, according to the Company's CEO in February of this year, was on track to succeed?  Shareholders deserve a satisfactory answer given the precipitous destruction of equity value.   This is especially true where, as here, the Noteholders and management stand to receive 99% of a significantly delevered company and the current equity is getting only 1%.  The reason this is so hard to swallow is that this is a company that everyone was led to believe (and still believes) has a bright, prosperous future ahead.  Its future may be even brighter after the restructuring – in which case the Noteholders may receive a healthy windfall.  That windfall should not come at the expense of the Shareholders.

7.     In a number of recent cases, existing equity holders in public companies in the oil and gas sector have obtained a recovery in pre-arranged chapter 11 cases, which is greater than

---

[5] Source: S&P Global Transcript of FQ4 2018 Earnings Call, February 1, 2019 at p. 8.

what is offered here, where the unsecured noteholders were seemingly taking a discount on the face amount of their claims.  For example, in Parker Drilling, the unsecured noteholders received 71% recovery, while existing equity received 1.7% of new common stock, plus warrants.  In EV Energy Partners, unsecured noteholders received 58% recovery, while existing equity received 5% of the new common stock, plus warrants.  In Walter Investment Management, unsecured noteholders received 68% recovery, while existing equity received 13.5% of the new common stock, plus warrants.  In Bonanza Creek, 50% for unsecured creditors, 4.5% for existing equity, plus warrants.  In Stone Energy, 42.5% for unsecured noteholders, 5% for existing equity, plus warrants.  In Key Energy, 15% for unsecured noteholders and 5% for equity, plus warrants.  In each of the examples above, recovery for existing equity is greater than the 1% offered here – in most cases, by a wide margin.  One would think that a company like Weatherford, upon emergence from chapter 11, having executed on its operational transformation, would have greater upside potential (and therefore more equity value) than what is reflected in the RSA deal.

8.      Indeed, it has been inexplicably difficult to make sense of the Company's widely varying 2019 EBITDA projections.  One year ago, this Company had a market capitalization in excess of $3 billion, and the Company was in the process of executing its "Transformation Plan" to achieve $1 billion in incremental EBITDA, as well as cost savings through a number of initiatives.  As noted above, in February of 2019, on an earnings call, the Company's CEO said the Company was on track to meet their goals.  The Company also took affirmative steps in April to make its stock more attractive to investors, including by proposing the Reverse Stock Split, which the Company put to a shareholder vote for their annual meeting in June.  But, by the end of April 2019, and into early May, when the Company was negotiating the RSA with its Noteholders,

the Company decided, seemingly abruptly, to alter its course of transformative action in favor of the RSA, which has been presented on an accelerated timeline.

9.      Again, it doesn't add up.  A statutory Equity Committee is needed to conduct an investigation regarding the events leading to the RSA and the treatment under the Plan, including the broad releases contemplated by the RSA and included in the Plan.  In addition, beyond an investigation, the Shareholders need advocacy.  A statutory equity committee will provide an appropriate means to address these concerns, and others, as they arise, and provide equal footing for Shareholders.

10.     These Chapter 11 Cases are undeniably large and complex.  The Debtors have approximately $8.35 billion of funded debt, more than 1 billion shares of common equity that is widely held, and operations in over 80 countries worldwide.  In the absence of an Equity Committee, it is unlikely any properly-incentivized party in interest will be reviewing the Plan, the Disclosure Statement, and other filings in the foreign and domestic restructuring cases with the exactitude necessary to ensure the rights of all Shareholders are adequately represented.

11.     These Chapter 11 Cases are just the first step in the worldwide restructuring of Weatherford Parent.  Confirmation of the Debtors' Plan will be followed immediately by an Irish Examinership Proceeding, pursuant to which Weatherford Parent will (after the Confirmation Date of the Plan, but before consummation) propose a "Scheme of Arrangement" under Irish law to:

> deal with the: (i) cancellation of all Existing Common Stock; (ii) issue of New Common Stock and New Warrants to the Holders of Existing Common Stock; and (iii) issue of New Common Stock and New Tranche B Senior Unsecured Notes to the holders of Allowed Prepetition Notes Claims each on terms consistent with the Plan.

Disclosure Statement at 27.  In other words, the foreign "Scheme of Arrangement" under Irish law will seemingly follow the dictates of the confirmed Plan, otherwise the Plan cannot go effective.

*See* Plan at Article IX.B.10, Conditions Precedent to Consummation: "The Irish Scheme of Arrangement has been approved by the High Court of Ireland.").

12.     In this regard, the Plan seeks to impose a "deathtrap" for the Irish Examinership — approve the Scheme of Arrangement, or the chapter 11 Plan falls apart.  Whether the Irish High Court would be persuaded by such a deathtrap is questionable, but this Court should be guided by the principles of comity to ensure it is not creating post-confirmation issues in the Irish High Court.

13.     It appears the Shareholders are being used as a means to an end in the game.  Under the Irish Examinership, the failure to give a recovery to equity holders may raise questions about whether the Scheme of Arrangement is fair and equitable and not unfairly prejudicial to dissenting shareholders.  The token recovery to Shareholders may be a means for the Company to obtain favorable relief in Ireland, and by extension, the United States, while shutting out equity in the Chapter 11 Cases.

14.     In addition, there are questions about the balance sheet solvency of the Debtors, including before and at the time they entered into the RSA, which an Equity Committee should explore:

- One year ago, on July 2, 2018, Weatherford Parent's stock closed at $3.16 per share (a $3 billion market capitalization);
- In February 2019, Weatherford Parent's stock was trading at approximately $0.90 per share (a market capitalization of just under $1 billion); and
- Just before the RSA was announced, Weatherford Parent's stock was trading at approximately $0.40 per share, and the Company had put the 20:1 Reverse Stock Split on the agenda for its June 25, 2019 Annual General Meeting of Shareholders.  The Board was sending clear signals that it thought it could preserve equity value.

15.     While current Shareholders are receiving a distribution under the Plan on account of their existing equity interests, the Shareholders were not involved in negotiation of the RSA or

the Plan.  Further, the unsecured creditors' committee here is not properly incentivized to protect Shareholders given that (i) the Debtors are merely holding companies and do not have any meaningful general unsecured claims that are not subsumed in the RSA and (ii) the few general unsecured claims not covered in the RSA will be paid in full under the Plan.  In short, there are fundamental questions to be raised at the outset, by an Equity Committee, not after confirmation when the dictates of the Plan have been presented to the Irish Examiner in a "take it or leave it" scenario.  Given the dynamics of these Chapter 11 Cases, an Equity Committee should be appointed to fulfill that much-needed role.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

17.    On May 10, 2019, prior to the commencement of these Chapter 11 Cases, the Debtors entered into a Restructuring Support Agreement (the "RSA") with holders of approximately 62% in aggregate principal amount of the Debtors' outstanding unsecured notes.

18.    As set forth in the RSA and the accompanying term sheet attached thereto (the "Term Sheet"), the RSA contemplates a comprehensive restructuring (the "Transaction"), whereby, among other things, (a) the holders of unsecured notes (the "Noteholders") agreed to exchange a substantial portion of their existing unsecured notes for approximately 94% of the new common stock of the reorganized company (the "New Common Stock") and $1.25 billion of Tranche B Exit Notes, (b) all trade claims and other unsecured claims against the Company (with holders of all such claims, other than the Noteholders, being the "General Unsecured Creditors") will be paid in full, either through the Transaction, or in the ordinary course of business, (c) management receives 5% of the New Common Stock through the MIP, the terms of which remain

undisclosed, and (d) the Debtors' existing equity will be cancelled and exchanged for (x) approximately 1% of the New Common Stock, and (y) three-year warrants to purchase 10% of the New Common Stock.

19.     Immediately prior to the Petition Date, on June 28, 2019, the Debtors filed with the United States Securities and Exchange Commission their *Disclosure Statement For Joint Prepackaged Plan of Reorganization for Weatherford International PLC and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") along with their *Joint Prepackaged Plan of Reorganization For Weatherford International PLC and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "Plan") on a Form 8-K and disclosed they were commencing solicitation of their prepackaged chapter 11 Plan in contemplation of the commencement of the Chapter 11 Cases.  The Plan purports to effectuate the Transaction agreed to in the RSA, and provide for the distribution of New Common Stock to existing Shareholders.

20.     On July 1, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  The Debtors' Chapter 11 Cases are jointly administered under the above-captioned case number, but not substantively consolidated.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

21.     By letter dated July 1, 2019, the Movant requested that the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appoint an Equity Committee in these Chapter 11 Cases.  Both the Debtors and the Noteholders opposed the Movant's request for an Equity Committee.  On July 11, 2019, the U.S. Trustee informed the Movant of its decision not to appoint an Equity Committee at that time.[6]

---

[6] The decision of the U.S. Trustee not to appoint an Equity Committee states a conclusion with no explanation in accordance with its normal practice.  The Court reviews the U.S. Trustee's decisions *de novo*.  *See, e.g., In re Oneida*

## RELIEF REQUESTED

22.     The Movant respectfully requests the Court issue an order, substantially in the form attached hereto as **Exhibit A**, directing the appointment of an Equity Committee pursuant to Bankruptcy Code section 1102(a)(2).

## BASIS FOR RELIEF

23.     Bankruptcy Code section 1102(a)(2) provides that the Court may order the appointment of a statutory equity committee "if necessary to assure adequate representation of . . . equity security holders." 11 U.S.C. § 1102(a)(2).  The legislative history of Bankruptcy Code section 1102 explains the importance of statutory committees and highlights that Congress intended them to be the "primary negotiating bodies for the formulation of the plan of reorganization." *Collier Pamphlet Edition*, *Bankruptcy Code 2017* at 840.  They will "represent the equity security holders from which they are selected," "provide supervision of the debtor in possession," and "protect their constituents' interests." *Id*.  "The provision will be relied upon in cases in which the debtor proposes to affect . . . equity holders under the plan, and in which they need representation." H.R. Rep. No. 95-595, 95th Cong., 1st Sess., at 401 (1977).

24.     Courts in this circuit have applied the following factors in determining whether to appoint a statutory equity committee under Bankruptcy Code section 1102(a)(2): (i) whether the debtors are likely to prove solvent; (ii) whether equity is adequately represented by stakeholders already at the table; (iii) the complexity of the debtors' cases; (iv) the likely cost to the debtors' estates of an equity committee; and (v) the extent the debtors' shares are widely held and actively traded. *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 n.13, 217 (Bankr. N.D. Tex. 2009).[7]

*Ltd.*, No. 06-10489 (ALG), 2006 Bankr. LEXIS 780 (Bankr. S.D.N.Y. May 4, 2006); *In re Williams Commc'ns Grp.*, 281 B.R. 216, 219-20 (Bankr. S.D.N.Y. 2002).

[7] Another factor considered by courts in other districts has been the timing of the request for appointment of an equity committee. *See, e.g., In re TLC Vision (USA) Corp.*, No. 09-14473(KG), slip op. at 4 (Bankr. D. Del. Mar. 23, 2010)

Notably, "[u]nlike the cases from within the Second and Third circuit Courts of Appeals, the [*Pilgrim's Pride*] bankruptcy court seemed to place equal weight on each factor, ultimately determining that appointment was warranted."   Formation, Function & Obligations of Equity Committees in Chapter 11, *American College of Bankruptcy Best Practices Report* (2011) at 35.

25.     As set forth below, each of these factors weighs heavily in favor of appointing an Equity Committee in these Chapter 11 Cases.

## I.     Equity is Receiving A Distribution and Solvency is Not Necessarily a Determining Factor

26.     Where equity security holders are merely *likely* to receive a distribution pursuant to a plan, that fact supports the appointment of an equity committee.  *See, e.g., In re Ampex Corp.*, No. 08-11094, 2008 WL 2051128, at *1 (Bankr. S.D.N.Y. May 14, 2008); *see also Pilgrim's Pride*, 407 B. R. at 216 (indicating the debtors' solvency is one factor the court looked at when determining if appointment of an equity committee was warranted).  Indeed, only if a debtor is considered "hopelessly insolvent" is the appointment of an equity committee considered inappropriate.  *See, e.g., In re Emons Indus., Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) ("[T]his court is of the view that general no equity committee should be appointed when it appears that a debtors is hopelessly insolvent . . . ."); *Exide Techs. V. Wis. Inv. Bd.*, 2002 U.S. Dist. LEXIS 27210 at *4 (Bankr. D. Del. Dec. 23, 2002) ("If a debtor does not appear to be 'hopelessly insolvent,' courts consider the following additional factors in determining whether the equity holders are adequately represented without the appointment of an equity committee.").  Here, where a distribution to existing Shareholders is actually contemplated under the Plan, appointment of an Equity Committee is even more prudent because it is conceded the Shareholders must receive

---

[ECF No. 373] (court denied appointment of an equity committee as unnecessarily costly and counterproductive where the shareholders' motion was filed after three iterations of the debtors' plan of reorganization had already been filed).

a distribution.  The only question is how much.  That is exactly what an Equity Committee should determine.

27.    Critically, solvency is not necessarily a determining factor in a decision to appoint an equity committee.  In *In re Energy XXI*, Judge Isgur appointed an equity committee in an insolvent case where there were "perhaps unintentional" misrepresentations made sometime between December and mid-June (when he appointed the equity committee).  There, it was likely evident at the time of the appointment of the equity committee that equity would receive nothing.  As noted by Judge Isgur, "I have to guess — that even if there is a lawsuit against people by the debtor, it probably doesn't produce enough money to put you in the money."  *In re Energy XXI, Ltd.,* No. 16-31928 (Bankr. S.D. Tex. July 17, 2016) [ECF No. 543-1, Ex. A, at 4].

28.    Similarly, in *In re Oneida*, Judge Gropper directed the U.S. Trustee to appoint an equity committee notwithstanding certain evidence the debtors were insolvent because any determination regarding solvency would be premature prior to the confirmation hearing:

> [E]ven if the Court could weigh the evidence presented at the hearing, any such determination would run the risk of prejudicing one party or another because the very same issues will come before the Court shortly at a confirmation hearing.  Obviously, a main issue (possibly the only real issue) at that hearing will be whether there is any residual value for equity based on the Debtors' financial position as of the date of confirmation.  Under the circumstances of this case, it would be unduly prejudicial to all parties to make a preliminary determination on this issue for purposes of this motion, except to find that the issue of solvency is disputed by the parties and that the parties appear well prepared on the issue for a confirmation hearing in the near future.

*In re Oneida*, 2006 Bankr. LEXIS 780, at *6.  The Bankruptcy Court for the Southern District of New York in *Oneida* also emphasized the notion that general unsecured claims (if any) would be paid in full under the debtors' chapter 11 plan in its decision to appoint an equity committee.  The court found that, given the treatment of general unsecured claims, the statutory creditors'

committee would be the least likely party in interest to challenge the status quo, thereby depriving the chapter 11 cases of the "usual checks and balances." *Id.* at *8-9.  The parallels in these Chapter 11 Cases are striking.

29.     Here, the Debtors argue that existing equity is out of the money notwithstanding the recovery given to Shareholders pursuant to the Plan.  *See Declaration of Christoph Bausch, Executive Vice President and Chief Financial Officer of Debtor Weatherford International PLC, in Support of the Chapter 11 Petitions and First Day Pleadings* [ECF No. 9] (the "Bausch Declaration") ¶ 65.  But there is evidence that the Noteholders' recovery pursuant to the Plan is approaching 100%, such that the Shareholders may be entitled to the Debtors' residual enterprise value in an amount greater than the stock and warrants they will receive under the Plan.

30.     For instance, the high end of the Debtors' projected enterprise value range for the reorganized Debtors is $6.8 billion,[8] which would translate to a recovery of up to approximately 75% for the Noteholders using the Debtors' projections.[9]  Indeed, one independent industry analyst has estimated the Plan will provide Noteholders with up to a 96% recovery and another estimated the Noteholders would be given an 81% recovery by the RSA.[10]  A 75% - 96% recovery to the

---

[8] *See* Disclosure Statement, Exhibit E (Valuation Analysis), Section A ("Based on the Projections and solely for the purposes of the Plan, Lazard estimates that the potential range of Reorganized Weatherford's operations on a going concern basis (the "Enterprise Value") is approximately $4.80 to $6.80 billion.  Based on the potential range of Enterprise Value and assumed net cash of $320 million as of the Effective Date, Lazard estimates an imputed range of potential equity value of $2.62 to $4.62 billion, following the issuance of the $1.25 billion of Tranche A Exit Notes and $1.25 billion of Tranche B Exit Notes.

[9] Specifically, the Noteholders would receive Plan consideration comprised of $1.25 billion of Tranche B Exit Notes and 99% of the New Common Stock, which is valued by the Debtors up to $4.62 billion.  Assuming complete dilution by the MIP, the New Common Stock received by the Noteholders would be valued at $4.35 billion (*i.e.*, 99% x 95% x $4.62 billion).  Adding the additional $1.25 billion of exit notes yields an aggregate value of the Plan consideration of $5.6 billion, which would mean an approximately 75% recovery (*i.e.*, $5.6 billion / $7.42 billion).  Notably, this calculation uses the Debtors' projections for the value of the New Common Stock and completely ignores the value of any of the Debtors' tax attributes.

[10] *See* Bank of America Merrill Lynch, *Weatherford Int (subsidiary issuers) Commenced Voluntary Bankruptcy Procedures* (July 3, 2019), at 6; Debtwire, *Weatherford International – Analyst Snapshot – Update* (May 17, 2019)

Noteholders (excluding any value attributed to the Debtors' tax attributes) is simply too close to the solvency borderline to deny the appointment of an Equity Committee, particularly when there is no properly incentivized statutory creditors' committee to provide the necessary checks and balances in these Chapter 11 Cases.   As noted above, in Parker Drilling, EV Energy Partners, Walter Investment Management, Bonanza Creek, Stone Energy, and Key Energy, as well as other cases, unsecured noteholders received less than 100% recovery and existing equity was given a share of the new common stock, plus warrants, to account for the implied value of the reorganized company and the contribution of the unsecured creditors.   If the company is worth more after the restructuring than the amount of unsecured debt – then the unsecured noteholders should not get the windfall at the expense of equity.

31.     The Shareholders have not completed their solvency analysis, and are still receiving information from the Debtors in response to their requests.  Little information has been provided to the public as to how the Debtors' $4.8 – $6.8 billion valuation range was produced, but the Debtors do disclose that the valuation is premised in part on a $640 million projected EBITDA figure in 2019.   The high end of the Debtors' value of $6.8 billion is more than 10.6 times the $640 million projected EBITDA for 2019.  Critically, the $640 million EBITDA figure is projected to increase by 40% to $890 million in 2020 according to the Debtors' own projections.   At a 10.6x multiple, the reorganized Debtors' enterprise value would be $9.4 billion using the Debtors' projected 2020 EBITDA.  This would imply that the consideration received by the Noteholders pursuant to the Plan could exceed the entire principal balance of the Noteholders' claims.[11]   Such

("[W]e estimate the unsecured note holders will have an 81% recovery on a pro rata basis based on company estimates [in the RSA].").

[11] Taking a total enterprise value of $9.4 billion and then adding projected cash of $530 million and subtracting expected debt of $2.5 billion yields an expected reorganized equity value of $7.43 billion.  Assuming complete dilution by the MIP, the New Common Stock received by the Noteholders would be valued at $6.99 billion (i.e., 99% x 95% x $7.43 billion).  Adding the additional $1.25 billion of exit notes yields an aggregate value of the Plan consideration

a result is not permitted by the Bankruptcy Code.  *See, e.g., In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009) ("A corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims.") (collecting cases).

32.     Looking at the Company's peers, which are listed in the Company's latest SEC Form 10-K, the current median 2020 EBITDA multiple is 9.1x (according to CapitalIQ).  Using a 9.1x multiple on projected 2020 EBITDA of $890 million would imply an enterprise value of approximately $8.1 billion, before considering the value of the Debtors' tax attributes.  Under this approach, one would not have to assume a significant increase in EBITDA and/or a meaningful expansion in the EBITDA multiple for the implied enterprise value to meet or exceed the funded debt level.

33.     Interestingly, if one applies the 10.6x multiple to projected 2019 EBITDA at the time of the RSA press release (approximately $750 million), it would imply a total enterprise value of nearly $8 billion – before considering any valuation of the Company's tax attributes.  An $8 billion enterprise value is extremely close to the Company's total funded debt of $8.35 billion.  So at the time the Company and its Board decided to embark on this path, the Company seems to have not been hopelessly insolvent.  And while the Debtors now project 2019 EBITDA to be $640 million, what is not clear is how much this process the Company has chosen to pursue has contributed to this decline.

34.     The above analysis is simplistic, but without even factoring in a valuation of the Debtors' tax attributes, which are described by the Debtors to be at least $2 billion,[12] the near-term

---

of $8.24 billion as of the end of 2020, which is higher than the $7.42 billion par amount of the claims held by the Noteholders.  Again, this calculation uses the Debtors' projections for the value of the New Common Stock and ignores the value of any of the Debtors' tax attributes.

[12] *See Debtors' Emergency Motion for Entry of Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of, and Claims Against, the Debtors* [ECF No. 14] ¶ 9 ("One or more of the

recovery for Noteholders is within striking distance of exceeding their claims.  Moreover, the reorganized Debtors' cash balance is also projected to increase from $320 to $530 million by the end of 2020 as well.

35.    The *Energy XXI* case demonstrates that you need not be solvent to be entitled to an equity committee and *Oneida* holds that there is no need to conduct a premature valuation of the Debtors in the presence of *prima facie* evidence of potential solvency, particularly when there are non-solvency related factors supporting the appointment of an equity committee as there are in these chapter 11 cases.  Given the Debtors' own projections, an Equity Committee should be appointed to ensure that the reorganization process achieves a fair result for all the Debtors' stakeholders.

## II.    Shareholders Cannot Rely on Any Other Constituency for Adequate Representation

36.    The Debtors expect there will be no meaningful general unsecured claims in these Chapter 11 Cases that are not satisfied in the RSA and, in any event, other general unsecured claims are proposed to be paid in full, and will be unimpaired and deemed to accept the Plan.[13] Accordingly, the statutory creditors' committee, which traditionally plays the role of watchdog in ensuring funded debt does not claim a disproportionate value of the reorganized debtors for themselves, has little incentive to challenge the Plan and does not have any duty to, or other concern about, the Shareholders.  General Unsecured Creditors are largely indifferent to the ultimate valuation of the Debtors when they are being paid in full.  As things now stand, the Noteholders propose to "foreclose" on the assets of the Company and distribute such value to themselves, without any real market test to establish whether the price the Noteholders are paying

---

Debtors and their affiliates possess certain Tax Attributes, including, as of the Petition Date, estimated federal NOLs of approximately $2 billion.  The Tax Attributes are valuable assets.").

[13] *See* Bausch Declaration ¶ 42; Plan § III.B.8.

for not less than 94% of the New Common Stock is fair.  Without an Equity Committee, no party in interest in these Chapter 11 Cases will be properly incentivized to review the reorganization.

37.     Critically, the values of companies in the oil and gas industry are subject to extreme market swings given their correlation to commodity prices.  Commodity prices have fallen precipitously and the vast majority of oil and gas companies, including the Debtors, have suffered as a result.  *See* Bausch Declaration ¶ 44 ("Weatherford's operations have been and likely will continue to be affected by the volatility of oil and natural gas prices.  The oil and gas industry has seen one of the longest, steepest, and most sustained declines in oil and gas prices in recent history.").  Specifically, the WTI crude oil price has gone from approximately $75/bbl in October 2018 to below $45/bbl in January 2019.  Now, the WTI price is under $60/bbl.  Similarly, the price of brent crude oil has gone from approximately $85/bbl in September 2018 to approximately $63/bbl currently.  The price of natural gas exceeded $7/MMBtu in January 2018 and has been as high as $4.75/MMBtu in February 2019.  Now, the price of natural gas is below $3/MMBtu.[14] Given the precipitous decline in oil and natural gas prices, it is eminently reasonable to anticipate some form of rebound in such prices in the months ahead.  Under the current Plan, when such rebound in commodities prices occurs, the lion's share of the upswing will inure to the benefit of the Noteholders as opposed to the Shareholders, who are the residual stakeholders in the Debtors and deserve to participate in such an upswing.

38.     In short, the Company should not be permitted to siphon away value from its own Shareholders and give it to the creditors.    One cautionary tale is that of Visteon Corporation. Visteon, an auto parts manufacturer, filed for bankruptcy protection on May 28, 2008, shortly after

---

[14] The Movant can provide Bloomberg screenshots of the price history of WTI crude oil, brent crude oil, and natural gas upon request.

a collapse in the U.S. auto market.  In the months preceding the chapter 11 filing, the company's debt and equity prices dropped sharply, with the firm's stock eventually trading at less than $1 and its notes being traded at a discount.  Visteon's first chapter 11 plan provided secured term loan lenders with 96.2% of new common stock (and no recovery for unsecured noteholders, general unsecured creditors, or prepetition shareholders).  The junior stakeholders vehemently protested their treatment under the plan, negotiations ensued, and ultimately, the Visteon debtors filed a revised chapter 11 plan, which was confirmed.  The Visteon plan provided a substantial recovery to unsecured noteholders, general unsecured creditors, and prepetition shareholders. Despite the shareholders' enhanced recovery, however, the plan still provided too much value to senior creditors and insufficient value to the shareholders.   Post-confirmation EBITDA for Visteon was 89% higher than projected by management,[15] and noteholder recoveries, which were forecasted in the disclosure statement to be as high as 32.5%, actually ranged "from 70% to 282% . . . .."[16]  The overcompensation of Visteon's noteholders came directly from the pockets of Visteon's pre-bankruptcy shareholders.

39.    An Equity Committee should be appointed to ensure the inequitable result that occurred in Visteon is not repeated here.  This is particularly true given the Debtors do not anticipate any general unsecured claims, and such claims would be paid in full pursuant to the Plan in any event.  Just as in *Pilgrim's Pride* and *Energy XXI*, the appointment of an equity committee can be warranted even when an unsecured creditors' committee has been appointed.

---

[15] *See* Oren Livne & Josh Simpson, Restructuring Visteon, at 54 (Apr. 10, 2012).

[16] *Id.* at 57.

40. Indeed, Judge Sontchi in *Horsehead Holding* recently appointed an equity committee where the value of the debtors precipitously declined on the eve of bankruptcy with no clear explanation:

> And let me just say why [I am directing the appointment of an equity committee]. It's actually -- I'm going, frankly, out on a limb here from a standpoint of where the law puts me, which is to make some sort of determination that there is a reasonable or substantial likelihood of recovery to equity here. I can't make that determination today. And I'm not basing my decision on a determination as to whether there's a substantial likelihood of a recovery to equity here. I'm doing it, frankly, based on my experience and my concern of the situation here. **To put it bluntly, something doesn't smell right to the Court**. There were a series of statements made – they're public statements -- as to what value was. The markets were trading albeit at [depressed] prices, certainly not insolvent prices, based on publicly available information. And there was a sudden and precipitous decline in value that occurred at the time on or about the filing of bankruptcy in February.

> Credit markets reacted with shock, as did the equity markets. I don't know what happened, as I sit here today [I] don't know if there was inappropriate conduct or not. And I'm not appointing a committee based on a concern -- well, not a concern; based on some sort of likelihood or determination there was inequitable conduct. But there was a certain valuation scenario that existed pre-petition and there's a radically different valuation scenario that exists post-petition, and there's a sufficient amount of ambiguity as to what's right and who's right, that I believe it's appropriate in this unique circumstance to appoint an equity committee . . . .

> However, I think that given the way the facts have played out here, and the dramatic adjustment in management position, the dramatic adjustment in valuation, in a very short period of time, based on a trend of activity that was occurring over a longer period of time, raises concerns in the Court's mind.

*In re Horsehead Holding Corp.*, 2016 Bankr. LEXIS 3187 at *108-111 (Bankr. D. Del. May 2, 2016) (emphasis supplied).

41. Further, the Board and the Company have already committed to support the RSA and the Plan. "Where it is clear that the financial interests of certain members of a debtor's Board

are intertwined with the operations and fortunes of the debtor, an Equity Committee is an appropriate mechanism through which to protect shareholders." *American College of Bankruptcy Best Practices Report* at 47.  Here, the financial interests of the Board are undeniably intertwined with the fortunes of the Debtors.  The members of the Board will receive consideration through the Plan in the form of comprehensive releases.  In addition, the Debtors' CEO has already been guaranteed a Board seat for the reorganized Debtors and the remaining six Board seats will all be decided by the Noteholders (*i.e.*, the major beneficiaries of the current unjust Plan).[17]  Indeed, existing management is heavily incentivized to consummate the current Plan because of the Management Incentive Plan offering up to 5% of New Common Stock to management.  Using the Debtors' projection of reorganized equity value of up to \$4.62 billion, management could be receiving up to a staggering \$231 million (*i.e.*, 5% x \$4.62 billion) in equity.

42.     In describing *Pilgrim's Pride*, the *American College of Bankruptcy Best Practices Report* described the rational for appointment of an equity committee as follows:

> The court, agreeing with the Equity Committee proponents, recognized that, due to the personal interests of certain directors (which directors stood to benefit from a plan of reorganization that preserved the debtors as going concerns and, thus, were inclined to support a conservative valuation of the debtors preferred by creditors to gain their support for such a plan), the Board was not in a position to 'press equity's case very hard.'

*American College of Bankruptcy Best Practices Report* at 47.  Given the particularities of these Chapter 11 Cases described herein, there is no question that the Board and management is not in

---

[17] *See* Disclosure Statement, Section IV.E.14 ("The New Board will be composed of seven (7) directors, one of whom will be Mark A. McCollum, the chief executive officer of the Debtors, and six (6) of whom will be designated by the Ad Hoc Noteholder Committee (in consultation with Mark A. McCollum, the chief executive officer of the Debtors and subject to the obligation of the Ad Hoc Noteholder Committee to meet and interview upon reasonable notice any existing members of the Debtors' board of directors who express interest in serving on the New Board.").

a position to "press equity's case very hard."  An Equity Committee should be appointed so that a fair and balanced chapter 11 plan can be negotiated among the relevant parties in interest.

## III.  The Incremental Administrative Costs of an Equity Committee Will Not Outweigh the Clear Benefits Statutory Representation Will Yield

43.     The relative cost of an Equity Committee in these massive Chapter 11 Cases is far outweighed by the potential benefit of having an Equity Committee to represent the interests of all Shareholders.  The Shareholders could easily enhance their recovery and cover the cost of an Equity Committee by transferring a portion of the excessive value going to management through the MIP and the Noteholders through the Plan consideration.

44.     Further, it would not be fair for a fraction of the Shareholders to take on the issues raised by these Chapter 11 Cases for the benefit of all Shareholders while at the same time shouldering 100% of the cost.  Shareholders have been stripped of significant value, and are concerned that the Noteholders and management are receiving a windfall at the shareholder's expense.  It would be unjust for them to incur additional costs to protect what they assert is being inappropriately taken away from them.  The standard is not (nor should it be) whether a party can or cannot afford counsel in these proceedings.  The issue is whether it is appropriate for 25% of the shareholders to pay the costs to protect 100% of the shareholders.

45.     Counsel to the Shareholders has been approached by other shareholders, who are supportive, but may not be in a position to pay.

## IV.  These Chapter 11 Cases are Undeniably Complex

46.     There is no question that these Chapter 11 Cases are complex.  The Debtors' own counsel conceded as much at the outset of the first day hearing.  *See* July 2, 2019 Transcript, at 9, line 21 ("[I]f you like complicated cases, Your Honor, you'll love this one . . . .").  Weatherford is a global oilfield services company with operations in 80 countries throughout the world.  Out of

the 256 affiliated corporate entities, only three are currently Debtors and two of them will be filing additional insolvency proceedings in foreign jurisdictions (Ireland and Bermuda). Further, the Debtors hold approximately $8 billion of funded debt and have issued 13 different series of unsecured notes with wildly varying maturity profiles.

47.     Further, there are particular facts in these Chapter 11 Cases that are unique and must be investigated before a determination can be made that the current Plan satisfies the statutory confirmation requirements. As noted above, on April 30, 2019—just over two months ago—the Board proposed the 20:1 Reverse Stock Split, which would have reduced the roughly 1 billion of outstanding shares of stock to just over 50 million shares, in an effort to avoid being de-listed by the NYSE. The deadline to submit ballots for such reverse stock split was June 24, 2019. On June 25, 2019, however, the Board adjourned the Reverse Stock Split proposal.

48.     It remains unclear how, on April 30, 2019, the Board believed a Reverse Stock Split was a prudent action for the Company to take, and yet reversed course only ten days later. An Equity Committee can conduct diligence on the circumstances surrounding this reversal, whether alternative options are (or were) available to return value to Shareholders and all of the Debtors' stakeholders, and help the Court and parties in interest better understand why the Company's prospects for remaining listed on the New York Stock Exchange dropped so precipitously.

49.     In addition, an Equity Committee should make inquiry regarding the propriety of the Irish Examinership for a company that is headquartered in Switzerland and has operations in the United States. An Equity Committee should inquire whether Ireland is an appropriate center of main interest for any purported restructuring.

50.     The bankruptcy process requires checks and balances to ensure the plan negotiation and confirmation process is fair to all stakeholders. Given the significant complexity of these

Chapter 11 Cases, it is particularly critical that an official committee with the proper incentives is appointed so that the Court can have comfort that the proposed chapter 11 Plan meets the statutory confirmation requirements. Accordingly, an Equity Committee should be appointed to fulfill the critical checks and balances that the chapter 11 system demands.

## EMERGENCY CONSIDERATION

51.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Movant respectfully requests emergency consideration of this Motion. Pursuant to this Court's *Order Conditionally Approving Disclosure Statement* [ECF No. 89], a hearing to consider confirmation of the Debtors' Plan has been scheduled for September 11, 2019. There is simply not a great deal of time left in these Chapter 11 Cases if the current confirmation schedule is upheld, so the prompt appointment of an Equity Committee is critical to the advocacy needs of the Shareholders. Indeed, a delayed appointment of an Equity Committee would severely limit the options of an Equity Committee and the timeframe within which it must advocate for its constituency. Accordingly, the Movant submits that it has satisfied the requirements of Bankruptcy Local Rule 9013-1(i) and, therefore, respectfully requests that the Court approve the relief requested in this Motion on an emergency basis.

## NOTICE

52.     Notice of this Motion will be given to: (i) the U.S. Trustee; (ii) the parties included on the Debtors' consolidated list of the holders of the 30 largest unsecured claims against the Debtors; (iii) Simpson Thacher & Bartlett LLP as counsel to the agent for the Debtors' prepetition secured revolving credit facility, the Debtors' prepetition secured term loan facility, and the Debtors' prepetition unsecured revolving credit facility; (iv) Deutsche Bank Trust Company Americas as indenture trustee for the Debtors' prepetition notes; (v) Akin Gump Strauss Hauer &

Feld LLP as counsel to that certain ad hoc committee of holders of prepetition notes; (vi) Shearman & Sterling LLP as counsel to the DIP Agent; (vii) the Committee of Unsecured Creditors; and (viii) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required or needed under the circumstances.

*[Remainder of page intentionally left blank]*

WHEREFORE the Movant respectfully requests that the Court (a) issue an order, substantially in the form attached hereto as **Exhibit A**, directing the appointment of an Equity Committee pursuant to Bankruptcy Code section 1102(a)(2), and (b) grant the Movant such other and further relief as is just.

Dated: July 22, 2019
      New York, New York

Respectfully submitted,

*/s/ Timothy Q. Karcher*
Martin J. Bienenstock
Timothy Q. Karcher (admitted *pro hac vice*)
Steven H. Holinstat
Chris Theodoridis
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Counsel to the Ad Hoc Committee of*
*Equityholders*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 22, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Chris Theodoridis*
Chris Theodoridis

## **Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | § |
| | § |
| | § Case No. 19-33694 (DRJ) |
| WEATHERFORD INTERNATIONAL | § |
| PLC, *et al.*, | § Chapter 11 |
| | § |
| Debtors.[18] | § (Jointly Administered) |
| | § |
| | § |

**ORDER GRANTING MOTION OF
AD HOC COMMITTEE OF EQUITYHOLDERS FOR AN ORDER
APPOINTING AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

Upon consideration of the motion dated July 22, 2019 (the "Motion") of the Ad Hoc Committee of Equityholders for an order appointing an official committee of equity security holders (an "Equity Committee") pursuant to section 1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"); and this Court having jurisdiction to consider and determine the Motion and all relief requested therein; and due and sufficient notice of the Motion having been given under the circumstances; and this Court having convened a hearing at which all interested parties had an opportunity to appear and be heard; and after considering all responses to the Motion, after due deliberation and sufficient causes appearing therefor; it is:

1.      Ordered that the Motion is GRANTED; and it is further

---

[18] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:   Weatherford International plc (6750); Weatherford International Ltd. (1344); and Weatherford International, LLC (5019).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 2000 St. James Place, Houston, TX 77056.

2.      Ordered that, pursuant to Bankruptcy Code section 1102(a)(2), the Office of the United States Trustee shall convene a meeting for the purpose of appointing a statutory committee of equity security holders in these Chapter 11 Cases.

_____
THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

DATED:  August ___, 2019
              Houston, Texas