

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
08/01/2019

| | | |
|---|---|---|
| In re: | § | Case No. 19-33694 (DRJ) |
| | § | |
| WEATHERFORD INTERNATIONAL | § | Chapter 11 |
| PLC, *et al.*, | § | |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**FINAL ORDER (A) AUTHORIZING THE DEBTORS TO
OBTAIN POST-PETITION FINANCING, (B) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(D) MODIFYING THE AUTOMATIC STAY, AND (E) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion") of Weatherford International plc ("WIL-Ireland"),
Weatherford International Ltd. ("WIL-Bermuda"), and Weatherford International, LLC ("WIL-
Delaware," and together with WIL-Ireland and WIL-Bermuda, the "Borrowers," and "Debtors"),
each as a debtor and debtor-in-possession in the above-captioned chapter 11 cases (collectively,
the "Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 507 of
title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"),
rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy
Rules"), and rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Local Rules of the United
States Bankruptcy Court for the Southern District of Texas and the Texas Complex Chapter 11
Case Procedures (together, the "Local Bankruptcy Rules"), seeking entry of an Interim Order (as
defined herein) and a final order (this "Final Order"), *inter alia*:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Weatherford International plc (6750); Weatherford International Ltd. (1344); and
Weatherford International, LLC (5019).  The location of the Debtors' main corporate headquarters and the
Debtors' service address is:  2000 St. James Place, Houston, TX 77056.

(i)         authorizing the Borrowers to enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), among the Borrowers, Citibank, N.A., as issuing bank, administrative agent and collateral agent (the "DIP Agent")[2] and the other agents and entities from time to time party thereto, the financial institutions from time to time party thereto as letter of credit issuers (the "DIP L/C Issuers"), and the financial institutions from time to time party thereto as lenders (collectively, the "DIP Lenders"), to obtain secured post-petition financing (the "DIP Financing") on a superpriority basis, consisting of (i) a superpriority revolving loan in an aggregate principal amount of up to $750,000,000 (as described in the DIP Credit Agreement, the "Revolving Credit Commitments" and, such facility, the "Revolving Credit Facility") (of which an aggregate principal amount of $500,000,000 was made available upon entry of the *Interim Order (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing The Debtors To Use Cash Collateral, (C) Granting Liens And Providing Superpriority Administrative Expense Status, (D) Modifying The Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* [D.I. 88] (the "Interim Order"), and the DIP Financing made available by the Interim Order, including without limitation under the Term Loan Facility (as defined below), the "Interim Borrowings"), that will be available to be borrowed by each of the Borrowers and guaranteed by certain other non-Debtor subsidiaries (collectively, the "Non-Debtor DIP Guarantors") of WIL-Ireland specified therein, including a letter of credit sub-facility in an aggregate amount of $50,000,000 (the "DIP L/C Sub-Facility"

---

[2]         As used herein, the term "DIP Agent" refers to Citibank, N.A., as administrative agent under the DIP Credit Agreement, Citibank, N.A., as collateral agent under the DIP Credit Agreement, or both, as the context requires.  All references in this Interim Order to the DIP Agent with respect to the Swap Banks or the Banking Services Banks (each, as defined herein) shall mean Citibank, N.A., in its capacity as collateral agent.  Citibank, N.A., in its capacity as administrative agent, has no duties or obligations to the Swap Banks or the Banking Services Banks.

and, combined with the Term Loan Facility and the Revolving Credit Facility, the "DIP Facility") and (ii) a superpriority term loan in an aggregate principal amount of $1,000,000,000 (as described in the DIP Credit Agreement, the "Term Loan Commitments" and, such facility, the "Term Loan Facility") that was borrowed by WIL-Bermuda following entry of the Interim Order and is guaranteed by WIL-Ireland, WIL-Delaware, and the Non-Debtor DIP Guarantors;

(ii)      authorizing each of the Debtors to execute and deliver the applicable Loan Documents (as defined in the DIP Credit Agreement); that certain Commitment Letter, dated as of July 1, 2019, by and among the DIP Agent, the Debtors, the Lead Arrangers (as defined in the DIP Credit Agreement) and the Term Lenders (as defined in the DIP Credit Agreement) (the "Commitment Letter"); that certain DIP Revolving Fee Letter, dated as of July 1, 2019, by and among the DIP Agent, the Debtors, and the Lead Arrangers (the "Revolving Fee Letter"); that certain Administrative Agent Fee Letter, dated July 1, 2019, by and between the Debtors and Citigroup Global Markets Inc. (the "Agent Fee Letter"); that certain Syndication Fee Letter, dated July 1, 2019, by and between the Debtors and Deutsche Bank Securities Inc. (the "Syndication Fee Letter"); and that certain DIP Term Fee Letter, dated July 1, 2019, by and among the Debtors and the Term Lenders (the "Term Fee Letter", together with the Commitment Letter, the Revolving Fee Letter, the Agent Fee Letter, the Syndication Fee Letter and the Loan Documents, collectively, the "DIP Documents"),[3] and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)      granting allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (as defined herein) in respect of the DIP Financing and all obligations

---

[3]      The DIP Credit Agreement, Commitment Letter, Agent Fee Letter, Revolving Fee Letter, Syndication Fee Letter, and Term Fee Letter were annexed to the Motion as Exhibits B through G, respectively.  The Court entered an order authorizing the Debtors to file the Revolving Fee Letter, Agent Fee Letter, Syndication Fee Letter, and Term Fee Letter under seal [D.I. 86].

owing thereunder and under the DIP Documents, including (a) Swap Obligations (as defined in

the DIP Credit Agreement) with the Debtors, and (b) Banking Services Obligations owing under

or in connection with any Banking Services (as defined in the DIP Credit Agreement) provided

by the DIP Agent and the DIP Secured Parties (as defined herein) (the obligations in this

paragraph collectively, and including all "Obligations" as defined in the DIP Credit Agreement,

the "DIP Obligations");

        (iv)     granting to the DIP Agent, for the benefit of itself, any sub-agents, the DIP

Lenders, the DIP L/C Issuers, any Lenders or any Affiliates of a Lender (as each is defined in the

DIP Credit Agreement) that are or become parties to Swap Agreements (as defined in the DIP

Credit Agreement) with the Debtors (the "Swap Banks"), and any Lender or any Affiliates of a

Lender that provide Banking Services (as defined in the DIP Credit Agreement) to any Debtor

(the "Banking Services Banks" and, collectively with the DIP Agent, the DIP L/C Issuers, the

DIP Lenders and the Swap Banks, the "DIP Secured Parties") automatically perfected security

interests in and liens upon all of the DIP Collateral (as defined herein), including, without

limitation, all property constituting "cash collateral," as defined in section 363(a) of the

Bankruptcy Code (the "Cash Collateral"), which security interests and liens shall be subject to

the priorities set forth in this Final Order;

        (v)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses,

and other amounts payable and reimbursable under the DIP Documents or this Final Order as

such amounts become due, including, without limitation, commitment fees, participation fees,

structuring and up-front fees, letter of credit fees (including issuance, fronting, and other related

charges), administrative agent's fees, and all invoiced reasonable and documented out of pocket

costs, fees, and expenses incurred by the Administrative Agent, the Collateral Agent (as defined

in the DIP Credit Agreement), any Issuing Bank (as defined in the DIP Credit Agreement) and the DIP Lenders (as defined herein) in connection with the DIP Financing, all to the extent provided in, and in accordance with the terms of, the DIP Documents and this Final Order;

(vi)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, as limited by this Final Order;

(vii)    authorizing the Debtors to borrow under the DIP Financing an aggregate principal amount of up to $1,750,000,000 consisting of (a) $1,000,000,000 in aggregate principal amount of loans under the Term Loan Facility and (b) up to $750,000,000 in aggregate principal amount of loans under Revolving Credit Facility, to be utilized for the immediate working capital needs and other general corporate purposes of the Debtors and their non-Debtor subsidiaries, including to fund transaction fees, obligations and expenses (including all negotiation, syndication, and documentation expenses), to the extent provided for in the DIP Documents (including the DIP Credit Agreement) in connection with the execution and closing of the DIP Financing and the Permitted Refinancing (as defined below);

(viii)    authorizing the Debtors, with the proceeds of the DIP Financing, to (a) repay all loans and other obligations (the "Prepetition Secured Obligations") under the Prepetition Secured Revolving Credit Facility (as defined below) and the Prepetition Secured Term Facility (as defined below, and collectively with the Prepetition Secured Revolving Credit Facility, the "Prepetition Secured Facilities," and the repayment of such obligations being the "Prepetition Secured Refinancing") and (b) cash collateralize letters of credit outstanding under the Prepetition Revolving Facility (as defined below) pursuant to the Cash Collateral Agreement, dated as of July 3, 2019, among non-Debtor Weatherford Bermuda Holdings Ltd. and the

Prepetition Revolving Agent (the "Prepetition Revolving Facility Cash Collateral Agreement"; and the cash collateral contained therein, the "Prepetition Revolving Facility Cash Collateral"; and such cash collateralization being the "Prepetition Revolving Facility L/C Cash Collateralization");[4]

(ix)    authorizing the Debtors, with the proceeds of the DIP Financing, to cash collateralize Prepetition Bilateral L/C Obligations (as defined below) (such cash collateralization being the "Prepetition Bilateral L/C Cash Collateralization" and the cash collateral provided therein being the "Prepetition Bilateral L/C Cash Collateral"; and the Prepetition Bilateral L/C Cash Collateralization together with Prepetition Secured Refinancing and the Prepetition Revolving Facility L/C Cash Collateralization, the "Permitted Refinancing");

(x)    authorizing the Debtors to obtain and cash collateralize postpetition letters of credit under the Bilateral L/C Facilities (as defined below), and honor all obligations in connection therewith, in the ordinary course of business, in accordance with the terms of the Bilateral L/C Facility Documents (as defined below);

(xi)    authorizing the Debtors in accordance with the terms hereof to use Cash Collateral pursuant to section 363 of the Bankruptcy Code and all other Prepetition Secured Collateral (as defined below);

(xii)    authorizing any other entities affiliated with the Debtors that subsequently commence jointly administered chapter 11 cases, if any, to enter into the Guarantee (as defined in the DIP Credit Agreement); and

(xiii)    granting the Prepetition Revolving Parties (as defined below) automatically perfected Prepetition Revolving Facility Liens (as defined below) upon the Prepetition Revolver

---

[4]    The Prepetition Revolving Facility Cash Collateral Agreement is annexed to the Motion as Exhibit H.

Collateral (as defined below), which Prepetition Revolving Facility Liens shall be subject to the priorities set forth in this Final Order and the Intercreditor Agreement, dated as of July 3, 2019, by and among the Prepetition Revolving Agent (as defined below) and the DIP Agent (the "DIP/Unsecured Revolver Intercreditor Agreement").

The Court having considered the DIP Motion, the First Day Declaration, the Omohundro Declaration and the Yearley Declaration in support of the Motion filed contemporaneously with the Motion, the DIP Documents, all filed objections and responses, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on July 2, 2019 (the "Interim Hearing"); and the court having entered the Interim Order and scheduled the Final Hearing (the "Final Hearing") to be held before this Court on August 1, 2019 to consider entry of this Final Order, and having held the Final Hearing and considered the evidence submitted or adduced and the arguments of counsel made at the Final Hearing; and notice of the Final Hearing having been given in accordance with rules 4001(b), (c), and (d), and 9014 of the Bankruptcy Rules; and all objections, if any, to the relief set forth in this Final Order having been withdrawn, resolved, or overruled by the Court; and it appearing that the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors and their estates, creditors, and other parties in interest, and is appropriate for the continued operation of the Debtors' businesses; and after due deliberation and consideration and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]

A.     Petition Date.  On July 1, 2019 (the "Petition Date"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court") commencing these Cases.

B.     Debtors-in-Possession.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     Jurisdiction and Venue.  The Court has jurisdiction over this matter, these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. § 1334.  This matter as set forth in this Final Order is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent to the entry of a final order by the Court in connection with the DIP Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue for the Cases and the DIP Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  On July 1, 2019, the Court entered an order approving the joint administration of these Cases on a final basis.

D.     Committee Formation.  On July 17, 2019, the United States Trustee for the Southern District of Texas appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (the "Committee").

---

[5]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

E.    <u>Prepetition Indebtedness</u>:

(i)    <u>Prepetition Secured Term Loan Facility</u>.  Prior to the Petition Date, WIL-Bermuda, as borrower, and WIL-Ireland entered into that certain Term Loan Agreement dated as of May 4, 2016 (as amended, amended and restated or otherwise modified from time to time prior to the date hereof, the "<u>Prepetition Secured Term Loan Credit Agreement</u>" and all other documentation executed in connection therewith, the "<u>Prepetition Secured Term Loan Facility Documents</u>," and all indebtedness and obligations thereunder, the "<u>Prepetition Secured Term Loan Facility</u>") among, *inter alia*, WIL-Bermuda, WIL-Ireland, the lenders party thereto (the "<u>Prepetition Secured Term Lenders</u>"), and JPMorgan Chase Bank, N.A. as administrative agent (the "<u>Prepetition Secured Term Loan Administrative Agent</u>" and, together with the Prepetition Secured Term Lenders and the other Secured Parties (as defined in the Prepetition Secured Term Loan Credit Agreement), the "<u>Prepetition Term Loan Secured Parties</u>").  As of the Petition Date, the aggregate principal outstanding in respect of the Prepetition Secured Term Loan Facility was approximately $297,500,000.  The obligations under the Prepetition Secured Term Loan Facility were guaranteed by WIL-Ireland, WIL-Delaware and a material portion of WIL-Ireland's non-Debtor subsidiaries organized in various specified jurisdictions throughout the world (the "<u>Prepetition Non-Debtor Guarantors</u>"), and secured by the Collateral (as defined in the Prepetition Secured Term Loan Credit Agreement) (the "<u>Prepetition Secured Collateral</u>"), on a first-lien basis.  As a result of events of default that existed under the terms of the Prepetition Secured Term Loan Facility Documents as of the Petition Date, the Prepetition Secured Term Lenders had the right to exercise remedies against the Prepetition Non-Debtor Guarantors and Prepetition Secured Collateral held by such entities, which, if exercised, would have caused immediate and irreparable harm to the Debtors and their subsidiaries.  Prior to the Petition Date,

the Debtors and the Prepetition Secured Term Lenders entered into a short-term forbearance agreement, which would have terminated if the Prepetition Secured Term Loan Facility had not been repaid (as it was on July 3, 2019) by the Interim Borrowings under the DIP Financing.

(ii)    Prepetition Secured Revolving Credit Facility.  Prior to the Petition Date, WIL-Bermuda, as borrower, and WIL-Ireland entered into that certain 364-Day Revolving Credit Agreement dated as of August 16, 2018 (as amended, amended and restated or otherwise modified from time to time prior to the date hereof, the "Prepetition Secured Revolving Credit Agreement" and all other documentation executed in connection therewith, the "Prepetition Secured Revolving Credit Facility Documents," and all indebtedness and obligations thereunder, the "Prepetition Secured Revolving Credit Facility") among, *inter alia*, WIL-Bermuda, the other borrowers party thereto, WIL-Ireland, the lenders party thereto (the "Prepetition Secured Revolving Lenders"), JPMorgan Chase Bank, N.A. as administrative agent (the "Prepetition Secured Revolving Administrative Agent"), and Morgan Stanley Senior Funding, Inc., as collateral agent (the "Prepetition Secured Revolving Collateral Agent" and, together with the Prepetition Secured Revolving Lenders and Prepetition Secured Revolving Administrative Agent, and the other Secured Parties (as defined in the Prepetition Secured Revolving Credit Agreement), the "Prepetition Revolver Secured Parties"; the Prepetition Revolver Secured Parties, together with the Prepetition Term Loan Secured Parties, the "Prepetition Secured Parties").  As of the Petition Date, the aggregate principal outstanding in respect of the Prepetition Secured Revolving Credit Facility was approximately $316,742,581.42.  The obligations under the Prepetition Secured Revolving Credit Facility were guaranteed by WIL-Ireland, WIL-Delaware and the Prepetition Non-Debtor Guarantors, and secured by a second lien (junior to the lien in respect of the Prepetition Secured Term Loan Facility) on the Prepetition

Secured Collateral constituting current assets owned by WIL-Bermuda and certain Prepetition Non-Debtor Guarantors (the "Prepetition Revolver Collateral"). As a result of events of default that existed under the terms of the Prepetition Secured Revolving Credit Facility Documents as of the Petition Date, the Prepetition Secured Revolving Lenders had the right to exercise remedies against the Prepetition Non-Debtor Guarantors and Prepetition Revolver Collateral, which, if exercised, would have caused immediate and irreparable harm to the Debtors and their subsidiaries. Prior to the Petition Date, the Debtors and the Prepetition Secured Revolving Lenders entered into a short-term forbearance agreement, which would have terminated if the Prepetition Secured Revolving Credit Facility had not been repaid (as it was on July 3, 2019) by the Interim Borrowings under the DIP Financing.

    (iii)  Prepetition Revolving Facility.

      a)  Prior to the Petition Date, WIL-Bermuda and WOFS Assurance Limited, a Bermuda exempted company ("WOFS"), as borrowers, and WIL-Ireland, entered into that certain Amended and Restated Credit Agreement dated as of May 9, 2016 (as amended, amended and restated or otherwise modified from time to time prior to the date hereof, the "Prepetition Revolving Credit Agreement" and all other documentation executed in connection therewith, the "Prepetition Revolving Facility Documents," and all indebtedness and obligations thereunder, the "Prepetition Revolving Facility") among, *inter alia*, WIL-Bermuda, WOFS, WIL-Ireland, the lenders party thereto (the "Prepetition Revolving Lenders") and JPMorgan Chase Bank, N.A. as administrative agent (the "Prepetition Revolving Agent" and, together with the Prepetition Revolving Lenders and the other Credit Parties (as defined in the Prepetition Revolving Credit Agreement, the "Prepetition Revolving Parties"). As of the Petition Date, the aggregate principal outstanding in respect of the Prepetition Revolving Facility was

approximately $305,000,000.00, and approximately $166,305,922.62 of outstanding letters of credit were issued under the Prepetition Revolving Facility (the "Prepetition Revolving Facility L/Cs"). The obligations under the Prepetition Revolving Facility are guaranteed by WIL-Ireland, WIL-Delaware and the Prepetition Non-Debtor Guarantors. As a result of events of default that existed under the terms of the Prepetition Revolving Facility Documents as of the Petition Date, the Prepetition Revolving Parties had the right to exercise remedies against the Prepetition Non-Debtor Guarantors, but entered into the Revolving Credit Facility Forbearance (as defined below). Moreover, the consent of the requisite Prepetition Revolving Lenders was required for the Non-Debtor DIP Guarantors to guaranty the DIP Financing. Without such consent for DIP Financing or if the Prepetition Revolving Lenders were to exercise remedies, the Debtors and their subsidiaries would suffer immediate and irreparable harm.

b) The lenders and issuing banks under the Prepetition Revolving Facility have agreed to forbear (such agreement, the "Revolving Credit Facility Forbearance")[6] from (among other things) exercising remedies as a result of the event(s) of default arising under the Prepetition Revolving Facility from the commencement of the Cases and consented to the incurrence of the DIP Financing, if, among other things, (i) this Final Order authorizes the Prepetition Revolving Facility L/C Cash Collateralization that is contemplated by the Permitted Refinancing and such refinancing and collateralization are so consummated, (ii) all Non-Debtor DIP Guarantors guarantee the Prepetition Revolving Facility on a *pari passu* basis with the DIP Facility, and (iii) the Debtors other than WIL-Bermuda and WIL-Ireland grant the Prepetition Revolving Facility Liens (as defined below) on the Prepetition Revolver Collateral (as defined below) to secure up to $100 million of the outstanding obligations under the Prepetition

---

[6]     The Revolving Credit Facility Forbearance is attached to the Motion as Exhibit I.

Revolving Facility for the benefit of the Prepetition Revolving Parties, which Prepetition Revolving Liens shall be junior to the DIP Liens on the Prepetition Revolver Collateral, except that such liens shall be *pari passu* with the DIP Liens if the Prepetition Revolving Facility is not paid in cash in full before November 30, 2019.

        (iv)      Prepetition Bilateral L/C Obligations.  As of the Petition Date, certain Debtors and/or non-Debtor subsidiaries of the Debtors (as applicable) had contingent reimbursement obligations (such reimbursement obligations, collectively, the "Prepetition Bilateral L/C Obligations"), certain of which have been guaranteed by one or more of the Debtors and Non-Debtor DIP Guarantors, in connection with letters of credit and letter of credit equivalents (collectively, the "Prepetition Bilateral L/Cs" and the issuers thereof, in such capacity and in their capacity as issuers of postpetition letters of credit in accordance with paragraph 18 hereof, the "Bilateral L/C Issuers").  The Prepetition Bilateral L/Cs support the operations of Debtors and non-Debtors and were issued and outstanding under certain bilateral letter of credit facilities (the "Bilateral L/C Facilities"; the reimbursement agreements, pledge agreements and related documents governing the Bilateral L/C Facilities, each as amended, amended and restated or otherwise modified from time to time, collectively, the "Bilateral L/C Facility Documents") entered into by the Debtors and/or the applicable non-Debtor subsidiaries of the Debtors prior to the Petition Date.  The approximate aggregate amount of letters of credit outstanding under the Bilateral L/C Facilities with each Bilateral L/C Issuer as of the Petition Date is set forth on Exhibit 1 to this Final Order.  The commencement of these Cases triggered defaults under certain Bilateral L/C Facilities requiring the applicable Debtors and/or their non-Debtor subsidiaries to cash collateralize certain Prepetition Bilateral L/Cs in accordance with the terms of the Bilateral L/C Facility Documents.

(v)      <u>Prepetition Senior Notes</u>.  Prior to the Petition Date, (a) WIL-Bermuda issued, and WIL-Ireland and WIL-Delaware guaranteed, (i) the 6.500% Senior Notes due August 1, 2036, (ii) the 7.000% Senior Notes due March 15, 2038, (iii) the 9.875% Senior Notes due March 1, 2039, (iv) the 5.125% Senior Notes due September 15, 2020, (v) the 6.750% Senior Notes due September 15, 2040, (vi) the 4.500% Senior Notes due April 15, 2022, (vii) the 5.950% Senior Notes due April 15, 2042, (viii) the 5.875% Exchangeable Senior Notes due July 1, 2021, (ix) the 7.750% Senior Notes due June 15, 2021, (x) the 8.250% Senior Notes due June 15, 2023, and (xi) the 9.875% Senior Notes due February 15, 2024; and (b) WIL-Delaware issued, and WIL-Ireland and WIL-Bermuda guaranteed, (i) the 6.800% Senior Notes due June 15, 2037 and (ii) the 9.875% Senior Notes due March 1, 2025 (collectively, the "<u>Prepetition Senior Notes</u>").

F.      <u>Findings Regarding Post-Petition Financing</u>.

(i)      <u>Request for Post-Petition Financing</u>.  The Debtors seek authority to obtain the DIP Financing, on the terms described in the Interim Order, this Final Order, and the DIP Documents, to provide them with the liquidity necessary to allow them to administer their Cases, satisfy corporate obligations, and consummate the Permitted Refinancing.

(ii)      <u>Need for Post-Petition Financing</u>.  Entry of this Final Order is necessary to allow the Debtors to consummate the Permitted Refinancing, administer and preserve the value of their estates, and satisfy other corporate expenses.  The Debtors do not have sufficient available sources of financing to consummate the Permitted Refinancing and satisfy their restructuring expenses and obligations without the DIP Financing.

(iii)      <u>No Credit Available on More Favorable Terms</u>.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been unable

to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Financing. The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also have been unable to obtain financing, in a sufficient amount or on adequate terms to satisfy the Debtors' obligations, solely by having the financing (a) have priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) be secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) be secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a post-petition basis is not otherwise available on the terms available under the DIP Financing without granting the DIP Agent, for the benefit of itself, its sub-agents, and the DIP Secured Parties, (x) perfected security interests in and liens on (each, as provided in this Final Order) all of the DIP Collateral with the priorities set forth in this Final Order, (y) superpriority claims as set forth in this Final Order, and (z) the other protections set forth in this Final Order.

(iv)    Need for the Permitted Refinancing. The Permitted Refinancing is appropriate because of the unique nature of the Debtors' assets and worldwide business operations. Namely, substantially all of the Debtors' directly owned assets, including their equity interests in certain non-Debtor subsidiaries, comprised the Prepetition Collateral. A significant portion of the Debtors' assets are owned by, and operations are carried out by, the Debtors' non-debtor subsidiaries, including the Prepetition Non-Debtor Guarantors. Absent the Permitted Refinancing, the Prepetition Term Loan Secured Parties, the Prepetition Revolver Secured Parties, the Prepetition Revolving Parties and certain of the Bilateral L/C Issuers would be or would have been able to exercise remedies against the Prepetition Non-Debtor Guarantors,

causing significant, immediate and irreparable deterioration in the value of the Debtors and their subsidiaries.  It, therefore, would not have been possible to find a party willing to provide post-petition financing in a sufficient amount, on acceptable terms, absent the Permitted Refinancing.

G.    Use of Proceeds of the DIP Financing and Payment of DIP Obligations.  As a condition to entry into the DIP Credit Agreement and the extension of credit under the DIP Financing, the DIP Agent, the DIP L/C Issuers and the DIP Lenders require, and the Debtors have agreed, that proceeds of the DIP Financing shall be used, in each case in a manner consistent with the terms and conditions of the final DIP Documents and this Final Order:  (a) to consummate the Permitted Refinancing, including by (1) repaying in full the Prepetition Secured Revolving Credit Facility and the Prepetition Secured Term Loan Facility and (2) satisfying (A) the Prepetition Revolving Facility L/C Cash Collateralization in an amount not to exceed $175,000,000 (the "Prepetition Revolver Cash Collateral Amount") and (B) the Prepetition Bilateral L/C Cash Collateralization in an amount not to exceed $500,000,000 less the Prepetition Revolver Cash Collateral Amount, (b) to pay the fees, costs and expenses required to be paid in connection with the transactions contemplated by the DIP Credit Agreement and the Cases, and to fund the Professional Fee Account (as defined below), (c) to finance the working capital needs and general corporate purposes of the Debtors and their non-Debtor subsidiaries following the commencement of the Cases, and (d) to pay obligations arising from or related to the Carve-Out (as defined below).

H.    Section 506(c).  In light of the DIP Agent's, the DIP L/C Issuers' and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, each of the DIP Agent, the DIP L/C Issuer and the DIP Lenders are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.     Good Faith of the DIP Agent and the DIP Lenders.

(i)     Willingness To Provide Financing.  The DIP Lenders have agreed to provide financing to the Debtors subject to (a) the entry of this Final Order, (b) approval of the terms and conditions of the DIP Financing, and the DIP Documents, and (c) entry of findings by the Court that (1) such financing is in the best interests of the Debtors' estates, (2) the DIP Agent, the DIP L/C Issuers and each of the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and (3) the DIP Agent's, the DIP L/C Issuers' and the DIP Lenders' claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Final Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Final Order or any other order.

(ii)     Business Judgment and Good Faith Pursuant to Section 364(e).  The terms and conditions of the DIP Financing and the DIP Documents, and the fees and expenses paid and to be paid thereunder and hereunder, are fair, reasonable, and the best available  to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Financing was negotiated in good faith and at arms' length among the Debtors, the DIP Agent, the DIP L/C Issuers and the DIP Lenders.  Credit extended under the DIP Financing shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Agent and each of the DIP L/C Issuers and DIP Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order.

J.      Good Cause.  The relief requested in the DIP Motion as set forth in this Final

Order is appropriate and in the best interests of, and will benefit, the Debtors and their estates,

creditors, and other parties in interest, as such relief, *inter alia,* will provide the Debtors and their

operating subsidiaries with the necessary liquidity to preserve and maximize the value of the

Debtors' estates for the benefit of all of the Debtors' creditors and other parties in interest.

K.      Notice.  In accordance with rules 2002, 4001(c) and (d), and 9014 of the

Bankruptcy Rules, the Local Bankruptcy Rules, and the Interim Order, the Debtors have served

(i) notice of entry of the Interim Order and of the Final Hearing and (ii) a copy of the Interim

Order on (a) the parties having been given notice of the Interim Hearing, (b) any other party that

had filed a request for notices with this Court as of July 3, 2019 (the initial date of such service),

and (c) the Committee.  Notice of the Interim Hearing and the Final Hearing having been given

by the Debtors in a manner consistent with the Bankruptcy Code and the Interim Order, the

Interim Hearing having been held by this Court on July 2, 2019, and the Final Hearing having

been held by this Court on August 1, 2019; and upon the record at the Interim Hearing and the

Final Hearing, and after due deliberation and consideration and sufficient cause appearing

therefor;

IT IS HEREBY ORDERED that:

1.      Financing Approved and Permitted Refinancing Authorized.  The relief sought in

the DIP Motion is granted in accordance with the terms and conditions set forth in this Final

Order and the DIP Loan Documents, and (i) the DIP Financing described herein is authorized

and approved, (ii) the consummation of the Permitted Refinancing is authorized and approved,

and (iii) the Debtors are authorized to use cash collateral, all as subject to the terms and

conditions set forth in this Final Order.  This Final Order shall be effective immediately upon its

entry, *provided*, *however*, that the provisions of this Final Order granting superpriority claims and liens shall be effective *nunc pro tunc* to (and in no event before) the Closing Date and the consummation of the Permitted Refinancing as described by paragraph 17 herein.  For purposes of this Final Order, the "Closing Date" shall mean the Effective Date as defined in the DIP Credit Agreement, or as otherwise provided in this Final Order.  Except as specifically amended, supplemented, or otherwise modified by this Final Order, all provisions of the Interim Order, including, but not limited to, findings of fact, conclusions of law, and authorizations made by this Court, remain in full force and effect and are hereby ratified by this Final Order and incorporated herein by reference as though set forth fully herein.

2.    Objections Overruled.  All objections to the DIP Motion, the DIP Financing, entry of the Final Order, and the related relief granted herein, to the extent not withdrawn or resolved, each as set forth in this Final Order, are hereby overruled.

**DIP Financing Authorization**

3.    Authorization of the DIP Financing.  In addition to the authority granted in the Interim Order, the Debtors expressly and immediately are authorized and empowered to execute and deliver the DIP Documents and other documents related thereto and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents, and to deliver all instruments and documents that may be required or necessary or reasonably requested by the DIP Agent for the performance by the Debtors under the DIP Financing and the creation and perfection of the DIP Liens described in, and provided for by, this Final Order and the DIP Documents.  The Debtors also are authorized and directed to pay, as such become due and without need to obtain further Court approval, in accordance with this Final Order, the principal, interest, fees, expenses, reimbursement obligations, and the other amounts payable or reimbursable by the Debtors pursuant to the DIP Documents including,

without limitation, commitment fees, participation fees, structuring and up-front fees, letter of

credit fees (including issuance, fronting, and other related charges), administrative agent's fees,

and all invoiced reasonable and documented out of pocket costs, fees, and expenses incurred by

the Administrative Agent, the Collateral Agent, any Issuing Bank, and the DIP Lenders in

connection with the DIP Financing, all to the extent provided in, and in accordance with the

terms of, the DIP Documents and this Final Order.  All collections and proceeds, whether

ordinary course or otherwise, will be applied as required by this Final Order and the DIP

Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding

obligations of the Debtors, enforceable against each of the Debtors and their estates in

accordance with their terms.

4.      <u>Authorization to Borrow</u>.  Until the Maturity Date (as defined in the DIP Credit

Agreement), and subject to the terms and conditions set forth in the DIP Documents, the DIP

Financing, and this Final Order, the Debtors are hereby authorized to borrow money and obtain

"Letters of Credit" as defined in the DIP Credit Agreement ("<u>DIP L/Cs</u>") under the DIP Facility,

and Debtor Guarantors (as defined in the DIP Credit Agreement) are hereby authorized to

guarantee such borrowings and the Debtors' obligations with respect to such DIP L/Cs.

5.      <u>Use of DIP Financing Proceeds</u>.  Immediately upon entry of this Final Order, the

Debtors are authorized to draw the full amount of the DIP Financing and use advances of credit

under the DIP Financing only for the purposes specifically set forth in, and subject to the terms

and conditions of, this Final Order and the DIP Documents, including the Permitted Refinancing.

The authorizations granted to the Debtors in the Interim Order to obtain credit under the DIP

Financing are hereby ratified by this Final Order.

6.       DIP Obligations.  The DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Cases, any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").

7.       DIP Liens.  To secure the DIP Obligations, effective pursuant to sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code, the DIP Agent, for the benefit of itself, any sub-agents, and the DIP Secured Parties, hereby is granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition security interests and liens (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "DIP Collateral"), subject to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of itself, any sub-agents, and the DIP Secured Parties, pursuant to this Final Order and the DIP Documents, the "DIP Liens") and notwithstanding any agreement that may purport to prevent, hinder, or attach obligations with respect to the incurrence of the DIP Liens:

(a)       First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien on all prepetition and post-petition property (other than real property) of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens (other than the liens of the Prepetition Secured Facilities that are repaid as contemplated by the Permitted Refinancing), including, without limitation, all inventory, equipment, accounts, cash and cash equivalents, general intangibles, intercompany receivables, contract rights, supporting

21

obligations and letter-of-credit rights, instruments (including, but not limited to, intercompany notes), deposit accounts, investment property, intellectual property, books and records, investments, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing. Notwithstanding the prior sentence, DIP Collateral shall in any event exclude the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but shall include any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions ("Avoidance Proceeds"), whether by judgment, settlement, or otherwise.  In addition, DIP Collateral shall exclude the Professional Fee Account (including funds held in the Professional Fee Account) if and when created under the terms hereof, except to the extent there is any surplus in such account after satisfaction in full in Cash of all obligations of professionals benefiting from the Carve-Out pursuant to a final order not subject to appeal; *provided, however*, that notwithstanding anything to the contrary herein, the Debtors may use funds held in the Professional Fee Account only to pay Professional Fees as they become allowed and payable pursuant to any interim or final orders of the Bankruptcy Court (including, without limitation, any order establishing procedures for the interim compensation of Professional Persons), and not for any other purpose.

(b)     Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien on all prepetition and post-petition property of the Debtors, whether existing

on the Petition Date or thereafter acquired, that was subject to valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date (other than the liens of the Prepetition Secured Facilities that are repaid as contemplated by the Permitted Refinancing), or to any valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agent are junior to such valid, perfected, and non-avoidable liens (the "Permitted Liens").

(c)　　Liens Senior to Certain Other Liens.  The DIP Liens shall be senior (and not junior or subordinate) to (i) any lien, mortgage or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the DIP Documents, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other domestic or foreign governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors.

(d)　　Notwithstanding anything to the contrary in the DIP Documents or this Final Order, for the purposes of this Final Order, in no event shall (x) the DIP Collateral include, or the DIP Liens (and with respect to the Prepetition Bilateral L/C Cash Collateral, the Prepetition Revolving Facility Liens) granted under this Final Order or the DIP Documents attach to, the Prepetition Revolving Facility Cash Collateral or the Prepetition Bilateral L/C Cash Collateral; *provided*, that the DIP Collateral shall include, and the DIP Liens granted under this Final Order and the DIP Documents shall attach to, any reversionary interest of the Debtors in the Prepetition Revolving Facility Cash Collateral and the Prepetition Bilateral L/C Cash Collateral; and (y) the

DIP Collateral include, or the DIP Liens or Prepetition Revolving Facility Liens granted under this Final Order attach to, Excluded Assets (as defined in the DIP Credit Agreement).

8.     _Prepetition Revolving Facility Liens_.  To secure the Obligations (as defined in the Prepetition Revolving Credit Agreement) under the Prepetition Revolving Facility Documents (the "_Prepetition Revolving Facility Secured Obligations_") in an amount not to exceed $100 million, pursuant to sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code, the Prepetition Revolving Agent, for the benefit of itself and the Prepetition Revolving Parties, hereby is granted a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition security interests and liens (the "_Prepetition Revolving Facility Liens_") on the DIP Collateral owned by the Debtors other than WIL-Bermuda and WIL-Ireland (such collateral, the "_Prepetition Revolver Collateral_"), which (subject to the following proviso) shall be junior in all respects to the DIP Liens; _provided, however_, that, in accordance with the terms of the DIP/Unsecured Revolver Intercreditor Agreement, the Prepetition Revolving Facility Liens shall become _pari passu_ in priority with the DIP Liens if on November 30, 2019, the Second Priority Obligations Payment Date (as defined in the DIP/Unsecured Revolver Intercreditor Agreement) shall not have occurred.

9.     _DIP Lien and Prepetition Revolving Facility Lien Priority_.  The DIP Liens and Prepetition Revolving Facility Liens are valid, binding, continuing, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that (i) the DIP Liens and Prepetition Revolving Facility Liens shall be junior only to (A) the Carve-Out, (B) Permitted Liens, (C) valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date (excluding liens of the Prepetition Secured Facilities that are repaid by the Permitted Refinancing), and

(D) any valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and (ii) the Prepetition Revolving Facility Liens shall also be junior to the DIP Liens in all respects, except if, and to the extent that, Prepetition Revolving Facility Liens become *pari passu* with DIP Liens in accordance with paragraph 8 of this Final Order.  The DIP Liens and Prepetition Revolving Facility Liens shall be senior to any and all forms of adequate protection (if any) granted in the Cases.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens or the Prepetition Revolving Facility Liens.

10.    <u>DIP Superpriority Claims</u>.  The DIP Agent and the DIP Secured Parties hereby are granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations:  (a) except as set forth in this Final Order, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and post-petition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including Avoidance Proceeds); and

(b) which at all times shall be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject only to the payment of the Carve-Out, to the extent specifically provided for in this Final Order.

11.     <u>No Obligation to Extend Credit</u>.  The DIP Agent, the DIP L/C Issuers and the DIP Lenders shall have no obligation to make any loan or advance, or to issue any letter of credit, under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Final Order have been satisfied in full or waived in accordance with the terms of the DIP Documents.

**Use of Cash Collateral**

12.     The Debtors hereby are authorized to use Cash Collateral and other property in which the DIP Agent and Prepetition Secured Parties have an interest pursuant to sections 363(b) and 363(c) of the Bankruptcy Code in accordance with and subject to the terms and conditions of the DIP Credit Agreement, this Final Order, the Prepetition Revolving Facility Cash Collateral Agreement, the Bilateral L/C Facility Documents,[7] and the order authorizing the Debtors to, among other things, continue using their cash management system [D.I. 90] (the "<u>Cash Management Order</u>").

**DIP Financing**

13.     <u>Amendments to the DIP Documents</u>.  The Debtors hereby are authorized to implement, in accordance with the terms of the DIP Documents, (a) any nonmaterial modifications (including, without limitation, any change to the number or composition of the

---

[7]     For the avoidance of doubt, any Cash Collateral pledged as security for letter of credit exposure under the Prepetition Revolving Facility Cash Collateral Agreement or Bilateral L/C Facility Documents shall not be available for use by the Debtors unless and until such Cash Collateral is, or is required to be, returned to the Debtors in accordance with the terms of such arrangements.

DIP Lenders) of the DIP Documents without further order of the Court, and (b) any other modifications to the DIP Documents, *provided, however*, that notice of any material modification or amendment to the DIP Documents shall be provided to the U.S. Trustee and to the Committee, each of whom shall have five (5) days from the date of such notice within which to object, in writing, to such modification or amendment.  If the U.S. Trustee or the Committee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis.

14.     <u>Budget and Annual Forecast Reporting</u>.  Commencing with the 4-week period ending July 26, 2019, on or before the last Business Day at the end of every 4-week period, the Borrowers will provide the DIP Agent (for distribution to each of the DIP Lenders) with a projected statement of sources and uses of cash for the Debtors and the Guarantors that are Domestic Subsidiaries or Canadian Subsidiaries (on a consolidated basis) broken down by weeks, for the succeeding 13 calendar weeks, including the anticipated uses of the proceeds of the DIP Credit Facilities for each week during such period (the "<u>DIP Budget</u>"), in the form of the projections most recently delivered to the DIP Agent on or prior to the Petition Date (the "<u>Initial DIP Budget</u>").  The Borrowers also shall provide the DIP Agent (for distribution to each of the DIP Lenders), on or before the day falling on a Friday following the end of every 2-week period, with a variance and reconciliation report, certified by a Responsible Officer (as defined in the DIP Credit Agreement) and in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (as defined in the DIP Credit Agreement) for the prior 2-week period included in the latest DIP Budget delivered pursuant to this paragraph, (A) showing, for

each week, actual total net cash receipts and disbursements, (B) noting therein variances for each line item on a rolling 4-week basis from projected values set forth for such periods in the relevant DIP Budget and (C) providing an explanation for all material variances; *provided that,* under the terms of the DIP Credit Agreement, the existence of any variance (whether material or not) shall not constitute a Default or an Event of Default under the DIP Credit Agreement.  The Debtors shall provide to the Prepetition Revolving Agent (for distribution to the Prepetition Revolving Lenders), and the Committee, copies of the DIP Budget, projections, variance and reconciliation reports, certificates and explanations provided to the DIP Agent.

15.     <u>Modification of the Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code hereby is modified solely to the extent necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claims, (b) permit the Debtors to perform such acts as the DIP Agent and the DIP Lenders each may request in its sole discretion to assure the perfection and priority of the liens granted in this Final Order, (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent and the DIP Secured Parties under the DIP Documents and this Final Order, (d) authorize the Debtors to make payments, and the DIP Agent, the DIP Lenders and the beneficiaries of the Permitted Refinancings to retain and apply payments made, in accordance with the terms of this Final Order, and (e) permit the Prepetition Unsecured Revolving Facility Agent and Bilateral L/C Issuers to exercise the applicable rights set forth in paragraphs 17 and 18 of this Final Order.

16.     <u>Perfection of DIP Liens and Prepetition Revolving Facility Liens</u>.  This Final Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection, and priority of all liens granted in this Final Order, including the DIP Liens and

Prepetition Revolving Facility Liens, without the necessity of filing or recording any financing statement, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice of lien, or other instrument or document, which may otherwise be required under the law or regulation of any jurisdiction, or the taking possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, securities account control agreement, or other similar agreement) to grant, attach, validate, or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or Prepetition Revolving Facility Liens, or to entitle the DIP Agent, the DIP Secured Parties, Prepetition Revolving Parties or other secured parties pursuant to the DIP Documents or this Final Order to the priorities granted in this Final Order.  Notwithstanding the foregoing, the DIP Agent and Prepetition Revolving Agent are authorized, but not required, to file, as each in its sole discretion deems necessary, such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and Prepetition Revolving Facility Liens, and all such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or Prepetition Revolving Facility Liens on any DIP Collateral or Prepetition Revolver Collateral owned by the Debtors.  The Debtors are authorized and directed to execute and deliver promptly following written demand to the DIP Agent and Prepetition Revolving Agent (as applicable) all such financing statements, mortgages, notices, and other documents and information as the DIP Agent or Prepetition Revolving Agent may reasonably request, in accordance with the DIP

Documents and this Final Order. The DIP Agent and Prepetition Revolving Agent, each in its discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of lien, or similar instrument. In furtherance of the foregoing and without further approval of the Court, each Debtor is (a) authorized to do and perform all acts to make, execute, and deliver all instruments and documents and provide all information and (b) authorized and directed to pay all fees that, in each case, may be reasonably required or necessary for the Debtors' performance hereunder.

17.    The Permitted Refinancing. On the Closing Date, the Debtors were authorized by the Interim Order (with such authorization remaining in full force and effect and being hereby reaffirmed) to use the proceeds of borrowings under the DIP Credit Agreement (in accordance with the terms of the DIP Credit Agreement) to repay in full all obligations (other than any indemnities and other contingent obligations that are intended to survive repayment of the obligations under the Prepetition Secured Revolving Credit Facility Documents or the Prepetition Secured Term Loan Facility Documents) then outstanding under the Prepetition Secured Revolving Credit Facility Documents (including all "Obligations" as defined in the Prepetition Secured Revolving Credit Agreement, the "Prepetition Secured Revolving Obligations") and the Prepetition Secured Term Loan Facility Documents (including all "Obligations" as defined in the Prepetition Secured Term Loan Credit Agreement, the "Prepetition Secured Term Loan Obligations"), whereupon all liens, mortgages and security interests granted under the Prepetition Secured Revolving Credit Facility Documents and the Prepetition Secured Term Loan Facility Documents were deemed released and of no further force or effect, and all guarantees in connection with the Prepetition Secured Revolving Credit

Facility and the Prepetition Secured Term Loan Facility were deemed released (and the Prepetition Secured Parties are hereby authorized and empowered upon the request, and at the expense, of the Debtors, whether through a payoff or similar letter or otherwise, to execute and deliver all documents to evidence the release of such liens, mortgages and security interests and guarantees, as applicable).  In addition, the Debtors were authorized by the Interim Order (with such authorization remaining in full force and effect and being hereby reaffirmed) to use the proceeds of the Interim Borrowings to provide or cause non-Debtor affiliates to provide the Prepetition Revolving Facility Cash Collateral to the Prepetition Revolving Agent, for the benefit of all Prepetition Revolving Parties, in order to accomplish the Prepetition Revolving Facility L/C Cash Collateralization; *provided*, that the aggregate amount of Prepetition Revolving Facility Cash Collateral shall not exceed the Prepetition Revolver Cash Collateral Amount.  The Debtors were also authorized by the Interim Order (with such authorization remaining in full force and effect and being hereby reaffirmed) and are hereby authorized to use the proceeds of the DIP Financing to provide the Prepetition Bilateral L/C Cash Collateral to the Bilateral L/C Issuers (including to an affiliate of any Bilateral L/C Issuer for the benefit of such Bilateral L/C Issuer), in order to accomplish the Prepetition Bilateral L/C Cash Collateralization; *provided*, that the aggregate amount of Prepetition Bilateral L/C Cash Collateral provided to the Bilateral L/C Issuers shall not exceed $500,000,000 less the Prepetition Revolver Cash Collateral Amount.  The Prepetition Revolving Agent and the applicable Bilateral L/C Issuers (x) shall be granted, effective as of the date of entry of this Order, valid, binding, continuing, enforceable, nonavoidable, automatically and properly perfected first-priority security interests in and liens upon the Prepetition Revolving Facility Cash Collateral (in the case of the Prepetition Revolving Agent) and the applicable Prepetition Bilateral L/C Cash Collateral (in the case of the Bilateral

L/C Issuers), and whether provided directly to a Bilateral L/C Issuer or to an affiliate thereof for the benefit of such Bilateral L/C Issuer, in each case, that is property of the Debtors, to secure the applicable letter of credit reimbursement obligations, and (y) are hereby permitted to access, control, maintain, apply and transfer their respective cash collateral in accordance with the terms of the Prepetition Revolving Facility Documents and Bilateral L/C Facility Documents (as applicable), as necessary to cash collateralize and satisfy the applicable letter of credit reimbursement obligations of the Debtors and/or their non-Debtor affiliates in accordance therewith, without further order of this Court, and the automatic stay (to the extent applicable) is hereby modified solely to the extent necessary to implement the foregoing.  For the avoidance of doubt, the Debtors are authorized to transfer funds to non-Debtor affiliates in connection with the foregoing.  Notwithstanding anything to the contrary herein, nothing in this Final Order shall limit the exercise of rights and remedies by any Bilateral L/C Issuer against any non-Debtor in accordance with the terms of the applicable Bilateral L/C Facility Documents.

18.    <u>Postpetition Bilateral Letters of Credit.</u>  The Debtors are hereby authorized to obtain and cash collateralize postpetition letters of credit under the Bilateral L/C Facilities (as defined below), and honor all obligations in connection therewith, in the ordinary course of business, in accordance with the terms of the applicable Bilateral L/C Facility Documents.  All Bilateral L/C Issuers for whose benefit cash collateral is provided pursuant to this paragraph 18 are hereby permitted to access, control, maintain and transfer such cash collateral in accordance with the terms of the Bilateral L/C Facility Documents, as necessary to cash collateralize the letter of credit reimbursement obligations of the Debtors and/or their non-Debtor affiliates, and apply such cash collateral in satisfaction of such reimbursement obligations, without further

order of this Court, and the automatic stay (to the extent applicable) is hereby modified solely to the extent necessary to implement the foregoing.

19.     Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers beyond those set forth Bankruptcy Code sections 1106(a)(3) and (4), or any responsible officer subsequently appointed in the Cases or any Successor Cases, obtains credit or incurs debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to such time as (i) the DIP Obligations (excluding any Swap Obligations and any Banking Services Obligations) indefeasibly have been paid in full, in cash, (ii) all Commitments (as defined in the DIP Credit Agreement) have been terminated, and (iii) all DIP L/Cs have been cancelled (or all such DIP L/Cs shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then cash proceeds derived from such credit or debt shall be used to the extent necessary to indefeasibly repay in full, in cash the DIP Obligations.

20.     Maintenance of DIP Collateral.  Until such time as all DIP Obligations (excluding any Swap Obligations and any Banking Services Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all DIP L/Cs have been cancelled (or all such DIP L/Cs shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), the Debtors shall (a) maintain and insure the DIP Collateral in amounts, for the risks, and by the entities as required under the DIP Documents and (b) maintain the cash management system in effect as of the Petition Date consistent with the Cash Management Order, or as otherwise required by the DIP Documents.

21.     <u>Maintenance of DIP L/Cs and Replacement of Prepetition Letters of Credit</u>.  To the extent permitted by the DIP Documents, the Debtors are authorized to renew DIP L/Cs on an uninterrupted basis and to take all actions reasonably appropriate with respect thereto.  Without limiting the foregoing, the Debtors are authorized to replace any Prepetition Revolving Facility L/C or Prepetition Bilateral L/C with new letters of credit issued under the DIP L/C Sub-Facility.

22.     <u>Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders</u>.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than as permitted in the DIP Documents (and, no consent shall be implied from any action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or an order of the Court); *provided* that the Debtors may release liens on the DIP Collateral solely to the extent permitted by the DIP Documents.

23.     <u>DIP Maturity Date</u>.  On the Maturity Date, the DIP Obligations immediately shall be due and payable, without notice or demand, and all Commitments shall terminate, in each case to the extent provided for under the DIP Credit Agreement.  In addition, on the Maturity Date (subject to the Remedies Notice Period set forth in paragraph 24 hereof with respect to the occurrence of the Maturity Date under clause (d) of the definition of Maturity Date, unless the DIP Obligations (excluding any Swap Obligations and Banking Services Obligations) indefeasibly have been paid in full, in cash, all Commitments have been terminated, and all DIP L/Cs have been cancelled (or all such DIP L/Cs have been fully cash collateralized or otherwise backstopped, in each case to the satisfaction of the applicable DIP L/C Issuer), all authority to use the DIP Collateral, including cash collateral, shall cease.

24.     <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), the DIP Agent, on behalf of the DIP Lenders,

may: (a) immediately (I) terminate the Commitments, and thereupon the Commitments shall terminate immediately; (II) declare the Loans (as defined in the Credit Agreement) then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Debtors accrued under the DIP Credit Agreement, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Debtors, and (III) require the Debtors to deposit in the LC Collateral Account (as defined in the DIP Credit Agreement) an additional amount in cash as reasonably requested by the Issuing Bank up to 105.0% of the relevant stated amount of the then outstanding LC Exposure (as defined in the DIP Credit Agreement); and (b) upon giving of five (5) business days' notice (with such notice filed on the docket using the CM\ECF Code for an emergency pleading) to the Debtors (with a copy to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee) (such five (5) business day notice period, the "Remedies Notice Period"), exercise all other rights and remedies provided in the DIP Documents, including, without limitation, against the DIP Collateral; *provided* that during the Remedies Notice Period, the only issue that may be raised by the Debtors in opposition to the exercise of such rights and remedies shall be whether an Event of Default has in fact occurred and is continuing.  Upon the occurrence of an Event of Default and expiration of the Remedies Notice Period, (a) the Debtors no longer shall have the right to use or seek to use the DIP Collateral, including cash collateral, (b) the automatic stay pursuant to section 362 of the Bankruptcy Code, as to all of the DIP Agent and the DIP Lenders, automatically shall be terminated without further notice to, or order of, the Court, and (c) the DIP

Agent, on behalf of itself and the DIP Lenders shall be permitted to exercise all rights against the DIP Collateral in accordance with the DIP Documents and this Final Order, and shall be permitted to satisfy the DIP Obligations, Swap Obligations (as defined in the DIP Credit Agreement) and Banking Services Obligations (as defined in the DIP Credit Agreement), without further order or application or motion to the Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.  Notwithstanding anything in this Final Order to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code automatically shall be terminated for the purposes of giving any notice contemplated hereunder. Notwithstanding anything herein to the contrary, nothing in this Final Order shall limit the exercise of rights and remedies against the Non-Debtor DIP Guarantors by the DIP Agent, DIP Lenders or the Prepetition Revolving Parties in accordance with, and subject to the terms and conditions of, their respective agreements governing their respective rights and remedies against the Non-Debtor DIP Guarantors, including, without limitation, in the case of the Prepetition Revolving Parties, the Revolving Credit Facility Forbearance.  The rights and remedies of the DIP Agent, DIP Lenders and the Prepetition Revolving Parties are subject to the terms of the DIP/Unsecured Revolver Intercreditor Agreement.

25.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order.  Based on the findings set forth in this Final Order and the record made during the Interim Hearing and the Final Hearing, in the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of the Court or any other court, the DIP Agent and each of the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  To the fullest extent permitted under section 364(e) of the Bankruptcy Code, any liens or claims granted to the DIP Agent and the DIP

Lenders hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted in this Final Order.

26.    <u>DIP and Other Expenses</u>.  Except as set forth below, the Debtors hereby are authorized and directed to pay all fees paid and payable, and all costs and expenses reimbursed or reimbursable, as set forth in the DIP Documents (including, for the avoidance of doubt, the non-refundable payment to the DIP Agent and the DIP Lenders, as the case may be, of the commitment, underwriting, structuring and administrative agency fees set forth in the applicable DIP Documents), without the necessity of any further application with the Court for approval or payment of such fees, costs, or expenses, whether such fees, costs and expenses were incurred prior to, on, or after the Petition Date.  The Debtors are authorized and directed to reimburse on the Closing Date (with respect to all fees and expenses required to be paid on the Closing Date), and thereafter within ten (10) calendar days of written demand by the DIP Agent (which shall not be more frequent than once per month), the DIP Agent, the DIP Lenders, and the Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication, and administration of the DIP Financing, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Financing, any exercise of remedies in respect thereof, and the reasonable and documented out-of-pocket prepetition and post-petition fees, charges, and disbursements of legal counsel advising the DIP Agent incurred in connection with the DIP Agent's participation in the Cases.  To the extent not included in the foregoing, the Debtors shall also pay all reasonable and documented fees, disbursements and other charges of (i) Akin Gump Strauss Hauer & Feld LLP as counsel to

the Term Lenders, (ii) Evercore Group LLC, as the financial advisor to the Term Lenders,

(iii) one counsel licensed in Bermuda and one counsel licensed in Ireland for the Term Lenders,

in each case whether incurred prior to, on, or after the Petition Date.  Payment of all such fees

and expenses shall not be subject to allowance by the Court; *provided, however*, that, other than

with respect to professional fees and expenses required to be paid on the date of entry of the

Interim Order or on the Closing Date, the Debtors shall promptly provide to the Debtors, the U.S.

Trustee and the Committee copies of invoices, which invoices shall not be required to contain

detailed time entries (but shall contain sufficient information for the Debtors, U.S. Trustee and

the Committee to evaluate the reasonableness of the fees and expenses for which payment is

sought therein), and which invoices may be redacted or modified to the extent necessary to delete

any information subject to the attorney-client privilege, any information constituting attorney

work product, or any other confidential information, and the provision of such invoices shall not

constitute any waiver of the attorney-client privilege or any of the benefits of the attorney work

product doctrine, received on account of fees and expenses of the professionals retained as

provided for in the DIP Credit Agreement, the DIP Documents, and this Final Order, and the

Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the

fees and expenses proposed to be paid, which objections may only be raised within ten (10)

calendar days after the foregoing parties' receipt thereof.  In the event that within that ten (10)

calendar day period the Debtors, the U.S. Trustee, or the Committee raises an objection to a

particular invoice, (a) the Debtors shall promptly pay only the fees and expenses not subject to

an objection, and (b) to the extent any objection is not resolved or withdrawn, the Debtors shall

pay the disputed amounts only upon the entry of an order of the Court resolving such dispute and

ordering the Debtors to pay the disputed amount.  Notwithstanding anything to the contrary in

this Final Order, but subject to the immediately preceding sentence, the fees, costs, and expenses of the DIP Agent, the DIP Lenders, and the Lead Arrangers payable under the DIP Documents and this Final Order, whether incurred prior to or after the Petition Date, shall be (x) deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable pursuant to, and in accordance with, the terms of the DIP Documents and, irrespective of any subsequent order approving or denying any other financing pursuant to section 364 of the Bankruptcy Code, (y) fully entitled to all protections of section 364(e) of the Bankruptcy Code and (z) included and constitute part of the DIP Obligations and be secured by the DIP Liens.  Notwithstanding anything herein to the contrary, nothing in this Final Order shall limit any obligations of non-Debtors to pay fees and expenses required under the DIP Loan Documents, Prepetition Revolving Credit Agreement, the Prepetition Revolving Credit Facility Forbearance, the Prepetition Revolving Facility Cash Collateral Agreement, the Bilateral L/C Facility Documents, or any related agreements with non-Debtors in accordance with the terms thereof.

27.    <u>Proofs of Claim/Master Proofs of Claim</u>.  The DIP Agent and the DIP Lenders will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed in this Final Order.  Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to the DIP Agent or the DIP Lenders, the Prepetition Secured Parties (with respect to the Prepetition Secured Obligations) or the Prepetition Revolving Parties (with respect to the Prepetition Revolving Facility). However, each of the Prepetition Secured Revolving Administrative Agent, the Prepetition Secured Term Loan Administrative Agent and the Prepetition Revolving Agent is authorized to file in the Debtors' lead chapter 11 case *In re Weatherford International PLC*, Case No., a master proof of claim on behalf of its respective Prepetition Secured Parties or Prepetition Revolving Parties, as

applicable, on account of any and all of their respective claims arising under the applicable loan documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties or applicable Prepetition Revolving Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Secured Revolving Administrative Agent, the Prepetition Secured Term Loan Administrative Agent or the Prepetition Revolving Agent, as applicable.

   28. Carve-Out.

    (a) Carve-Out.  As used in this Final Order, the "Carve-Out" means the sum, without duplication, of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees, costs and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees, costs and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and the Committee (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") appointed in the Case pursuant to section 1103 of the Bankruptcy Code at any time on or prior to the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice and without regard to whether such fees, costs

and expenses are provided for in the DIP Budget or were invoiced after the Carve-Out Trigger

Date (as defined below); and (iv) Professional Fees incurred after the first business day following

delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time,

whether by interim order, procedural order or otherwise in an aggregate amount not to exceed

$7,500,000 with respect to Professional Persons (the amounts set forth in this clause (iv) being

the "Post-Carve-Out Trigger Notice Cap").  For purposes of the foregoing, "Carve-Out Trigger

Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP

Agent to the Loan Parties, Latham & Watkins as their lead restructuring counsel, the U.S.

Trustee, and the Committee, which notice may be delivered only following the occurrence and

during the continuation of an Event of Default under the DIP Financing, and shall expressly state

that the Post-Carve-Out Trigger Notice Cap has been invoked.

       (b)    Carve-Out Reserves.  On the day on which a Carve-Out Trigger Notice is

received by the Debtors (such date, the "Carve-Out Trigger Date"), the Carve-Out Trigger

Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and

any available cash thereafter held by any Debtor (other than Prepetition Revolving Facility Cash

Collateral and Prepetition Bilateral L/C Cash Collateral) to transfer to the Professional Fee

Account (as defined below) cash in an amount equal to all obligations benefitting from the

Carve-Out as more fully set forth below.  On and after the Carve-Out Trigger Notice Date, the

DIP Agent shall deposit into a segregated account of the Debtors that is not subject to the control

of the DIP Agent, any DIP Lender or any lender with respect to any Prepetition Indebtedness

(the "Professional Fee Account"), any cash swept or foreclosed upon after delivery of the Carve-

Out Trigger Notice (including cash received as a result of the sale or other disposition of any

assets) until the Professional Fee Account has been fully funded (inclusive of any amounts on

deposit therein prior to the issuance of such Carve-Out Trigger Notice) in an amount equal to all obligations benefitting from the Carve-Out. Funds transferred to the Professional Fee Account shall be held in trust for the Professional Persons, including with respect to obligations arising out of the Carve-Out. Funds transferred to the Professional Fee Account shall not be subject to any liens or claims granted to the DIP Agents or Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute cash collateral; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fee Account, if any, after all allowed Professional Fees have been paid in full pursuant to a final order not subject to appeal, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. The Debtors may use funds held in the Professional Fee Account only to pay Professional Fees as they become allowed and payable pursuant to any interim or final orders of this Court, and not for any other purpose until all Professional Fees are paid in full in cash. Further, notwithstanding anything to the contrary herein, (i) the failure of the Professional Fee Account to be funded in an amount equal to the full amount of the obligations arising under the Carve-Out shall not affect the priority of the Carve-Out and (ii) in no way shall the Carve-Out, Professional Fee Account, or the DIP Budget or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

(c)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. The DIP Agent and the DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or

otherwise shall be construed to obligate the DIP Agent or the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Date.  So long as a Carve-Out Trigger Notice has not been delivered as provided above: (i) the Debtors shall be permitted to pay Professional Fees allowed and payable under sections 328, 330 or 331 of the Bankruptcy Code or other order of this Court, as the same may become due and payable, including on an interim basis; and (ii) such payments shall not reduce, or be deemed to reduce, the Carve-Out.

(e)     Payment of Carve-Out On or After the Carve-Out Trigger Date.  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice shall permanently reduce the Post-Carve-Out Trigger Notice Cap on a dollar-for-dollar basis.

(f)     Carve-Out Priority.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Loan Documents, the Carve-Out shall be senior in right of payment to all DIP Obligations and Prepetition Indebtedness and to all liens securing the same, in each case whether arising pursuant to the DIP Credit Facilities or otherwise.

29.     Limitations on the DIP Financing, the DIP Collateral, and the Carve-Out. Notwithstanding anything in this Final Order to the contrary, the Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Financing, the DIP Collateral, including cash collateral, or the Carve-Out, and no disbursements set forth in the DIP Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in

connection with (a) incurring Indebtedness (as defined in the DIP Credit Agreement) except to the extent permitted under the DIP Credit Agreement; (b) preventing, hindering, or delaying any of the DIP Agent's and the DIP Lenders' (in the case of each of the foregoing, in their respective capacities as such) enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, *provided*, that the foregoing shall not prohibit the Debtors or the Committee from using proceeds of the DIP Financing, DIP Collateral (including cash collateral) and/or the Carve-Out to assert, in accordance with paragraph 24 of this Final Order, that no Event of Default has occurred; (c) objecting, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations or the DIP Liens, or any other rights or interest of the DIP Agent or the DIP Secured Parties (in the case of each of the foregoing, in their respective capacities as such); (d) asserting, commencing, or prosecuting any claims or causes of action, whether arising prior to or after the Petition Date, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Agent or the DIP Secured Parties (including in their respective capacities as parties to the Restructuring Support Agreement (as defined in the DIP Credit Agreement)), or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees (in the case of each of the foregoing, in their respective capacities as such); or (e) asserting, joining, commencing, supporting, investigating, or prosecuting any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Released Parties (as defined herein), arising (prior to, on, or after the Petition Date) out of, in connection with, or relating to the DIP Financing, the DIP Documents, or the transactions contemplated hereunder or

thereunder and the documents executed in connection therewith, including, without limitation, (i) any action against the DIP Agent or DIP Lenders arising under the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action against the DIP Agent or DIP Lenders; (iii) any action with respect to the validity and extent of the DIP Obligations, the DIP Superpriority Claims, or the validity, extent, perfection, and priority of the DIP Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens or the DIP Superpriority Claims, in whole or in part; (v) appeal or otherwise challenge the Interim Order, this Final Order, the DIP Documents, the Restructuring Support Agreement, or any of the transactions contemplated in this Final Order or therein; and (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Agent or the DIP Lenders in respect of their liens and security interests in the DIP Collateral or any of their rights, powers, or benefits hereunder or in the DIP Documents anywhere in the world.

30.     <u>Payment of Compensation</u>.  Nothing in this Final Order shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person, whether paid prior to or following the Petition Date, or shall affect the right of the DIP Agent or the DIP Lenders to object to the allowance and payment of such fees and expenses.

31.     <u>Release</u>.

(a)     The Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the Cases or Successor Cases) and any party acting by, through, or under the Debtors or their estates, forever and irrevocably release,

discharge, waive and acquit the DIP Agent, Lead Arrangers and DIP Lenders, and each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case in their capacities as such, the "DIP Secured Party Releasees") of any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type (in each case, arising on or prior to the date of the Interim Order), whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Financing or DIP Documents; *provided*, that nothing herein shall relieve the DIP Secured Party Releasees from fulfilling their obligations or commitments under (x) the DIP Documents (as applicable) and (y) the terms of this Final Order.

(b)     The Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the Cases or Successor Cases) and any party acting by, through, or under the Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the DIP Agent, the Lead Arrangers, each of the DIP Lenders, each of the Prepetition Secured Parties, each of their respective participants and each of their respective affiliates, and each of their respective former,  current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors,

shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case in their capacities as such, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type (in each case, arising on or prior to the date of the Interim Order), whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Financing, the DIP Documents, the Prepetition Secured Revolving Credit Facility Documents, the Prepetition Secured Term Loan Documents or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, DIP Financing, the Prepetition Secured Revolving Credit Facility or the liens securing the same, or the Prepetition Secured Term Loan Facility or the liens securing the same, as applicable, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii)  any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent and the DIP Lenders or the Prepetition Secured Parties and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Obligations, the DIP Liens, the Prepetition Secured Revolving Credit Facility or the liens securing the same, or the Prepetition Secured Term Loan Facility or the liens securing the same; *provided*, that nothing

herein shall relieve the Released Parties from fulfilling their obligations or commitments under the (x) DIP Documents, the Prepetition Secured Term Loan Facility Documents, and the Prepetition Secured Revolving Credit Facility Documents (as applicable), (y) any forbearance agreements (as to the Prepetition Secured Parties) and (z) the terms of this Final Order.

32.     <u>No Third Party Rights</u>.  Except as explicitly provided for in this Final Order, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

33.     <u>Waiver of Right to Surcharge</u>.  Each of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims or other claims under sections 105(a) or 552(b) of the Bankruptcy Code are and shall be waived as to the DIP Agent, the DIP Lenders, and the DIP Obligations.  Accordingly, subject to the Carve-Out, no costs or expenses of administration or other charge, lien, assessment, or claim incurred at any time (including, without limitation, any expenses set forth in the DIP Budget) by any Debtor or any other person or entity shall be imposed or charged against any or all of the DIP Collateral, the DIP Agent, the DIP Lenders, or their respective claims or recoveries under the Bankruptcy Code, including sections 105(a), 506(c), 552(b) thereof, or otherwise, and the Debtors, on behalf of their estates, waive any such rights.  It is expressly understood by all parties that, *inter alia*, in providing the DIP Facility and agreeing to the Carve-Out and the use of Cash Collateral as provided herein, the DIP Agent and the DIP Lenders each have relied on the foregoing provisions of this paragraph. Notwithstanding any approval of or consent to the DIP Budget, other than the Carve-Out, nothing in this Final Order shall constitute or be deemed to constitute the consent by any of the DIP Agent and the DIP Lenders to the imposition of any costs or expense of administration or other charge, lien, assessment, or claim (including, without limitation, any amounts set forth in

the DIP Budget) against such party, its claims, or its collateral under sections 105(a), 506(c), or 552(b) of the Bankruptcy Code or otherwise and no such consent shall be implied from any other action or inaction by such parties.

34.    No Marshaling/Application of Proceeds.  The DIP Agent and the DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to the terms of the DIP Documents notwithstanding any other agreement or provision herein to the contrary, *provided, however*, that nothing in this Final Order shall impair the rights of the DIP Agent and the DIP Lenders with respect to the DIP Collateral.

35.    Payments Free and Clear.  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Final Order, any subsequent order of the Court, or the DIP Documents shall be irrevocable, received free and clear of any claim, charge, assessment or other liability (including, without limitation, (i) any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, (ii) or 552(b) of the Bankruptcy Code), and solely in the case of payments made or proceeds remitted after the delivery of a Carve-Out Trigger Notice, subject to the Carve-Out in all respects.

36.    Joint and Several Liability.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Financing and the DIP Documents.

37.    Discharge Waiver.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of

section 1141(d) of the Bankruptcy Code, unless and until the DIP Obligations have been paid indefeasibly in full, in cash, all Commitments have been terminated, and all DIP L/Cs have been cancelled (or all such DIP L/Cs shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) on or before the effective date of a confirmed plan of reorganization or liquidation.

38.   Rights Preserved.  Notwithstanding anything in this Final Order to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agent's or any of the DIP Lenders' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Agent or any of the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent or any of the DIP Lenders; or (d) the rights of the Debtors or any other party to object, contest, or assert defenses to, any of the foregoing, except as expressly waived, released or limited by this Final Order or the DIP Documents.

39.   No Waiver by Failure To Seek Relief.  The delay or failure of the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies under this Final Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, or any

party in interest, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

40.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Final Order, including all findings in this Final Order, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Agent, the DIP Secured Parties, any statutory or nonstatutory committees appointed or formed in the Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed for the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Debtors and their respective successors and assigns; *provided, however*, that the DIP Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agent and the DIP Lenders, in such capacities, (a) shall not be deemed to be in control of the operations of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute) and (b) shall not owe any fiduciary duty to any of the Debtors, their creditors, or their estates, or shall not constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

41.     <u>No Modification of Final Order</u>.  Unless and until the DIP Obligations (excluding any Swap Obligations and any Banking Services Obligations) have been indefeasibly paid in

full, in cash (such payment being without prejudice to any terms or provisions contained in the DIP Financing which survive such discharge by their terms), all Commitments have been terminated, and all DIP L/Cs have been cancelled (or all such DIP L/Cs shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), an Event of Default shall occur if the Debtors seek or consent to, directly or indirectly, or if there is entered:  (a) without the prior written consent of the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement), (i) any modification, stay, vacatur, or amendment to this Final Order, (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code, or section 506(c) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior in priority to the DIP Superpriority Claims, other than the Carve-Out, or (iii) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in this Final Order, the DIP Documents, or the DIP/Unsecured Revolver Intercreditor Agreement; (b) without the prior written consent of the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement), an order allowing use of the DIP Collateral, including cash collateral, unless otherwise permitted in the DIP Documents; (c) an order converting or dismissing any of the Cases; (d) an order appointing a chapter 11 trustee in any of the Cases; or (e) an order appointing an examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) in any of the Cases.

42.    Survival.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order that may be entered:  (a) confirming any plan of

reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which the Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections granted to the DIP Agent and the DIP Secured Parties pursuant to this Final Order and the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until, in respect of the DIP Financing, all the DIP Obligations (excluding any Swap Obligations and any Banking Services Obligations), pursuant to the DIP Documents and this Final Order, indefeasibly have been paid in full, in cash (such payment being without prejudice to any terms or provisions contained in the DIP Financing which survive such discharge by their terms), all Commitments have been terminated, and all DIP L/Cs have been cancelled (or all such DIP L/Cs shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers).

43.     Subsidiaries and Guarantors.  Any Subsidiary (as defined in the DIP Credit Agreement) of the Debtors that hereafter becomes a debtor in a case under chapter 11 of the Bankruptcy Code in the Court and is or is required to be a Guarantor (as defined in the DIP Credit Agreement) under the DIP Credit Agreement automatically and immediately, upon the filing of a petition for relief for such Subsidiary, shall be deemed to be one of the "Debtors" hereunder in all respects, and all the terms and provisions of this Final Order, including, those provisions granting security interests in, and Liens on, the DIP Collateral, and DIP Superpriority Claims in each of the Cases, immediately shall be applicable in all respects to such Subsidiary

53

and its chapter 11 estate.  Within five (5) business days of the filing of a petition for relief for any such Subsidiary, the Debtors shall file a notice with the Court indicating that the Subsidiary is a Guarantor under the DIP Credit Agreement and subject to this Final Order.

44.     <u>Payments Held in Trust</u>.  Except as expressly permitted in this Final Order, or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source before all DIP Obligations indefeasibly have been paid in full, in cash, all Commitments have been terminated, and all DIP L/Cs have been cancelled (or all such DIP L/Cs shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.

45.     <u>Credit Bidding</u>.  The DIP Agent shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

46.     <u>This Final Order Governs</u>.  In the event of any inconsistency between the provisions of this Final Order, on the one hand, and the Interim Order, DIP Documents, and any related documents, on the other hand, the provisions of this Final Order shall govern.

47.     <u>Effect of this Final Order</u>.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution thereof.

48.     <u>Chubb Reservation of Rights</u>.  For the avoidance of doubt, nothing in this Final Order or any document related thereto, including the DIP Credit Agreement, alters or modifies the terms and conditions of any insurance policies or related agreements issued by ACE American Insurance Company and Federal Insurance Company and each of their affiliates and successors to any of the Debtors.

49.     <u>Tax Liens</u>.  Notwithstanding any other provisions included in the Interim Order or this Final Order, or any agreements approved hereby, any statutory liens on account of ad valorem property taxes (collectively, the "Tax Liens") of Bexar County, Cypress-Fairbanks Independent School District, Harris County, Jim Wells CAD, Lee County, Nueces County and Victoria County (collectively, the "Taxing Authorities") shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount and extent of the claims and liens asserted by the Taxing Authorities are fully preserved. In the event any of the DIP Collateral that is subject to valid, senior, perfected and unavoidable Tax Liens of the Taxing Authorities is sold, the proceeds of such shall first be applied to the taxes owing to the Taxing Authorities before application to any DIP indebtedness.

50.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Final Order according to its terms.


**Signed:  August 01, 2019**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit 1

### Bilateral L/C Facilities[1]

| Bank | Amount of L/Cs Outstanding | Amount Currently Cash Collateralized (or otherwise secured) | Amount Currently Not Cash Collateralized |
|---|---|---|---|
| Standard Chartered Bank[2] | $108.6 million | $71.5 million | $37.1 million |
| Deutsche Bank | $72.2 million | $28.2 million | $44.0 million |
| Citibank | $26.0 million | $14.9 million | $11.1 million |
| Others[3] | $46.8 million | $22.4 million | $24.5 million |

---

[1]     Amounts in this Exhibit 1 are for informational purposes only and do not reduce or modify in any way the authority granted to the Debtors to cash collateralize letters of credit in accordance with the terms of, and subject to the limitations contained in, paragraph 17 of the Interim Order and paragraph 17 of the Final Order.

[2]     Includes Standard Chartered Bank, New York Branch; Standard Chartered Bank, UAE Branch; Standard Chartered Bank, Qatar Branch; Standard Chartered Bank (Singapore) Limited, Standard Chartered Bank Malaysia Berhad, and any other branch, affiliate or subsidiary of Standard Chartered Bank that has issued Prepetition Bilateral L/Cs (collectively, the "SCB Issuers"). Prepetition Bilateral L/C Cash Collateral initially will be deposited with Standard Chartered Bank, New York Branch, on behalf of itself and each other SCB Issuer.

[3]     "Others" includes Bilateral L/C Facilities with approximately 24 additional banks; the amounts set forth in this schedule reflect the aggregate amount of letters of credit issued across all of those facilities.